**Steve L. McKENZIE, D.O.,**
**Plaintiff–Appellant,**

v.

**MERCY HOSPITAL OF INDEPEN-**
**DENCE, KANSAS,**
**Defendant–Appellee.**

**No. 85–1732.**

United States Court of Appeals,
Tenth Circuit.

Aug. 10, 1988.

Leonard R. Frischer, Overland Park, Kan. (James T. McIntyre of Turner and Boisseau, Chartered, Wichita, Kan., on the brief), for plaintiff-appellant.

Wyatt A. Hoch (Jerry G. Elliott with him on the brief) of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for defendant-appellee.

Before HOLLOWAY and McKAY, Circuit Judges, and BURCIAGA, District Judge.*

McKAY, Circuit Judge.

Dr. Steve L. McKenzie appeals from the district court's grant of summary judgment dismissing his antitrust claims against Mercy Hospital of Independence, Kansas.[1] Dr. McKenzie, a doctor of osteopathy licensed by the state of Kansas, was granted conditional staff privileges at Mercy Hospital in 1978. His privileges were renewed with conditions in 1979 and 1980 and without conditions in 1981 and 1982. However, in late 1982, the Mercy Hospital board of trustees voted not to renew Dr. McKenzie's staff privileges for the following year, finding that he had violated hospital and medical staff bylaws and had engaged in unprofessional, disruptive conduct. Following an appeal to a three-member committee appointed under the hospital bylaws and a subsequent appeal to the entire board of trustees, Dr. McKenzie was notified that his privileges were permanently revoked.

In an amended complaint, Dr. McKenzie alleged that Mercy Hospital's refusal to renew his staff privileges violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982).[2] In his claim under Section 1,[3] Dr. McKenzie maintained that the revocation of his privileges was the consequence of a *per se* illegal tying arrangement established by Mercy Hospital. According to Dr. McKenzie, the bylaws, rules, and regulations of Mercy Hospital tied the market for physician services (the tied product) to the market for hospital facilities and services (the tying product). Brief of Appellant at 35–36. In his claim under Section 2 of the Sherman Act,[4] Dr. McKenzie asserted that the termination of his staff privileges constituted an unlawful refusal to deal. Specifically, Dr. McKenzie argued that his dismissal from the staff of Mercy Hospital violated the "essential facilities doctrine" as recognized under Section 2.

In a Memorandum and Order granting Mercy Hospital's Motion for Summary Judgment, the district court concluded that Dr. McKenzie had failed to establish the requisite elements of either antitrust claim as a matter of law. Responding to Dr. McKenzie's allegation of an unlawful tying arrangement, the court noted that Dr. McKenzie had named only Mercy Hospital as a defendant and had "showed no evidence of any concerted action with any other persons to unreasonably restrain

* Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, sitting by designation.

1. Mercy Hospital is a short-term general care hospital. It is the only hospital in Independence and one of only three hospitals in Montgomery County, Kansas. When Dr. McKenzie filed his lawsuit, Mercy Hospital was a non-stock, non-profit corporation wholly owned by the Religious Sisters of Mercy, an Order of the Roman Catholic Church. Record, vol. 2, at 380.

2. Dr. McKenzie originally brought this suit as a civil rights action under 42 U.S.C. § 1983 (1982), alleging that Mercy Hospital had violated his constitutional right to due process of law by terminating his staff privileges without providing him notice and an opportunity to defend himself. Later, Dr. McKenzie also moved for an injunction to compel Mercy Hospital to reinstate him until a trial could be held on the merits of his legal claim. The district court

denied the motion but allowed Dr. McKenzie to amend his complaint by adding the two antitrust allegations. The claim under section 1983, which was dismissed along with the antitrust claims, has not been renewed on appeal.

3. Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy" that *unreasonably restrains interstate commerce.* 15 U.S.C. § 1 (1982); *Board of Trade of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

4. Section 2 provides in part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2 (1982).

trade." Record, vol. 2, at 387. Addressing Dr. McKenzie's argument under Section 2, the court concluded that Dr. McKenzie's claim must fail for two reasons. First, Dr. McKenzie could "show no set of facts to establish [that he] and [Mercy Hospital] are competitors in any fashion relevant to this lawsuit." Record, vol. 2, at 384. Second, even if Dr. McKenzie and Mercy Hospital did compete in the physician services market, the facilities of Mercy Hospital were not essential to Dr. McKenzie's practice of providing non-emergency care. *Id.* at 384–85. The antitrust issues raised on appeal are precisely those presented to but rejected summarily by the district court.

When reviewing the propriety of a grant of summary judgment, we must closely scrutinize the district court's proceedings and the factual record presented to us. We apply a de novo standard of review to the court's conclusions of law, *Wheeler v. Hurdman*, 825 F.2d 257, 260 (10th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), and construe the facts in the record liberally in favor of the party opposing the motion for summary judgment. *Franks v. Nimmo*, 796 F.2d 1230, 1235 (10th Cir.1986). Here, the "facts that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), are not contested.[5] Only the legal conclusions that may properly be drawn from those facts remain unresolved.

### Illegal Tying Arrangement Under Section 1

A claim that conduct in the course of trade or commerce violates Section 1 calls for a two-part analysis. A reviewing court first conducts a preliminary examination of the plaintiff's allegation to ensure that the activity complained of is a practice forbidden by that provision of the Sherman Act. Only if this threshold inquiry is satisfied does the court move to the second stage of its analysis to consider the merits of the claim.[6]

■ If Dr. McKenzie is to prevail under Section 1, he must first show that the alleged tying arrangement is "concerted activity by individual actors." *Card v. National Life Insurance Co.*, 603 F.2d 828, 834 (10th Cir.1979). As the Court of Appeals for the Seventh Circuit has explained: "[t]he fundamental prerequisite [of a claim under Section 1] is unlawful conduct by two or more parties pursuant to an agreement, explicit or implied. Solely unilateral conduct, regardless of its anticompetitive effects, is not prohibited by Section 1. Rather, to establish an unlawful combination or conspiracy, there must be evidence that two or more parties have knowingly participated in a common scheme or design to accomplish an anticompetitive purpose. *Contractor Utility Sales Co. v. Certainteed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir.1981), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985); *accord Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 386 (10th Cir.1985); *see Pontius v. Children's Hospital*, 552 F.Supp. 1352, 1374 (W.D.Pa.1982).

■ It is precisely this preliminary showing that Dr. McKenzie has failed to make. The record before us lacks not only evidence of an unlawful tying arrangement, but also any allegation that Mercy Hospital has allied itself with any other "individual"

---

**5.** As it pertains to his essential facilities allegation, Dr. McKenzie and Mercy Hospital dispute the factual question of whether hospitals compete directly with physicians. Dr. McKenzie insists such competition is, in general, possible, and, in the service market in which both he and Mercy Hospital participate, undeniable. Brief of Appellant at 19–25. Mercy Hospital, on the other hand, argues that hospitals compete only with other hospitals. Brief of Appellee at 13. Given the nature of Dr. McKenzie's practice and the type of medical services Mercy Hospital offers, Dr. McKenzie has the more persuasive argument. But even if we adopt Dr. McKenzie's

view of this matter, our assumption would not assist in the disposition of the larger legal question of whether Mercy Hospital has violated section 2 of the Sherman Act by denying Dr. McKenzie access to an essential facility.

**6.** When addressing the merits of a Section 1 claim, the court either applies a "rule of reason" analysis to determine whether the challenged practice imposes an unreasonable restraint on trade or condemns the practice outright as a *per se* violation of the Sherman Act.

to tie a patient's choice of a physician in northern Montgomery County, Kansas,[7] to the patient's choice among the medical facilities available there. In his amended complaint Dr. McKenzie retained all the allegations of his original pleading [8] and added the assertion, among others, that Mercy Hospital "by monopolizing hospital facilities in violation of the Sherman Act, unlawfully established a tying arrangement by tying the use of medical facilities to the selection of physician services. This tying arrangement is a per se violation of the Sherman Act...." Record, vol. 1, at 47.

The fatal flaw in this revised pleading is, in part, carried over from the original complaint and, in part, due to omissions in the amendment itself. Dr. McKenzie names only a single entity, Mercy Hospital, as a defendant. Moreover, he fails to allege the involvement of any coconspirator and offers no evidence of "concerted activity" to support his claim under Section 1. The absence of any plausible assertion on which a factual issue may be grounded and the consequential impossibility of meeting the most fundamental requirements of a claim under Section 1 permit only one conclusion: dismissal of Dr. McKenzie's claim under Section 1 is proper as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("The moving party is 'entitled to a judgment as a matter of law' [where] the non-moving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.")

Dr. McKenzie argues that "[m]ulti-party action" is unnecessary to trigger a cause of action for unlawful tying. Brief of Appel-

lant at 37. All that is needed, he contends, "is simply an arrangement which links two separate and distinct product markets together." *Id.* Though he proposes a simplistic definition of an unlawful tying arrangement,[9] Dr. McKenzie is correct in his assertion that a single entity can establish one. *See, e.g., Sargent–Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 711–13 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). His argument is not persuasive, though, because it misses the point at issue in this appeal. Here, we are not concerned with the legal possibility of a single entity imposing a tying arrangement on its customers. The question before the court—and to which we have replied in the negative—is whether such an arrangement is proscribed by Section 1 of the Sherman Act.

### Violation of the Essential Facilities Doctrine Under Section 2

Generally, a competitor in a market is free to choose the parties to whom it will offer its products or services. In fact, "[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

█ However, the Sherman Act does prohibit certain refusals to deal if the refusal is part of a vertical integration scheme calculated to drive a competitor out of business. One way by which the federal courts enforce this prohibition is through application of the "essential facilities doc-

---

7. Dr. McKenzie has defined the relevant geographic market as the northern half of Montgomery County, Kansas. Appellant's Brief at 16–17. Mercy Hospital does not contest this assertion.

8. In his original complaint, Dr. McKenzie named only Mercy Hospital as a defendant and alleged only a civil rights violation, deprivation of rights guaranteed by the First, Fifth, and Fourteenth Amendments, and intentional interference with his practice of medicine. Record,

vol. 1, at 1–5. No cause of action grounded in the Sherman Act was set out.

9. The Supreme Court has defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958).

trine." Under the doctrine, the federal courts have declared that where it is economically infeasible for a monopolist's potential competitors to duplicate a facility controlled by the monopolist and needed to provide a product or service, the monopolist must make the facility available to the competitors on a nondiscriminatory basis.

The Supreme Court announced the essential facilities doctrine in *United States v. St. Louis Terminal Railroad Association*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), a case decided only twenty-two years after the Sherman Act became law. In *Terminal Railroad*, fourteen railroads, along with other transportation and mercantile interests, formed an association to control access to all the railway bridges crossing the Mississippi River at St. Louis. Due to the "geographical and topographical situation [of St. Louis, it was,] as a practical matter, impossible for any railroad company to pass through, or even enter St. Louis, so as to be within reach of its industry and commerce, without using the facilities entirely controlled by" the association. *Terminal Railroad*, 224 U.S. at 397, 32 S.Ct. at 510. As a result, the members of the association were able to prevent competing railroads from offering transportation services between St. Louis and East St. Louis, Illinois. The Supreme Court found the practice of denying access to the bridges a restraint of trade and required the defendants to allow competing railroads use of their facilities without regard to membership in the association. *Terminal Railroad*, 224 U.S. at 410, 32 S.Ct. at 515.

Though the Supreme Court first employed the essential facilities doctrine to condemn the conduct of multiple defendants under Section 1 of the Sherman Act, *see* 224 U.S. at 410–11, 52 S.Ct. at 516, the doctrine has since been applied in cases brought under Section 2 and in which only a single entity controls the necessary facility. For example, in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377–79, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973), the Supreme Court employed the essential facilities doctrine to conclude that a regulated electric utility had used its monopoly power unlawfully to eliminate competition in the retail sale of electric power.

More recently, the federal courts of appeals have adopted standards to determine whether a monopolist's refusal to deal constitutes a violation of the essential facility doctrine under Section 2. In *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), the court held that to establish liability under the doctrine, the plaintiff must show: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the facility; (3) the denial of the use of the essential facility to a competitor; and (4) the feasibility of providing the facility." The Seventh Circuit's criteria were distilled from the holding in *Hecht v. Pro–Football, Inc.*, 570 F.2d 982 (D.C.Cir.1977), in which the court found a professional football stadium in Washington, D.C. to be an essential facility.[10]

At the outset of our review of Dr. McKenzie's claim under Section 2, we note that the identity of the essential facilities has shifted as the proceedings in the district court have progressed. In his amended complaint, Dr. McKenzie specified the entire hospital as an essential facility. Record, vol. 1, at 46. Yet fourteen months later, while opposing Mercy Hospital's Motion for Summary Judgment, Dr. McKenzie adopted the *Hecht/MCI* criteria and identified obstetrical care and emergency care as the only service markets in which he competed directly with Mercy Hospital.

**10.** Two years after *Hecht* was decided, the Court of Appeals for the Sixth Circuit held that a monopolist's vertical integration scheme violates Section 2

1) where integration facilitates price discrimination so that the monopolist can reap the maximum monopoly profit from different consumers; 2) where integration increases first-level entry barriers so that potential competitors are stymied; and 3) where integration facilitates evasion of regulation of monopoly profits.

*Byars v. Bluff City News Co.*, 609 F.2d 843, 861 (6th Cir.1979).

Record, vol. 2, at 240. Apparently by then Dr. McKenzie believed that the essential facilities from which he had been excluded consisted of only these two areas of the Hospital. Still later, at the conclusion of the district court proceedings, the description of the essential facility changed again. When granting Mercy Hospital's Motion for Summary Judgment, the court limited "the facilities in question" under Dr. McKenzie's Section 2 claim to Mercy Hospital's emergency room. Record, vol. 2, at 386.

The record does not disclose Dr. McKenzie's reasons for refining his description of the essential facilities. Nor does it explain the district court's decision to pare the "facilities in question" down to Mercy Hospital's emergency room. But consistent with the modicum of evidence the record contains about Dr. McKenzie's practice and our obligation to interpret the record in his favor, the facilities we will consider in this appeal consist of both the emergency room and the obstetrical care unit.

The application of the *Hecht/MCI* criteria to the circumstances of this case defines the burden Dr. McKenzie must carry to prevail under Section 2. For Dr. McKenzie to establish Mercy Hospital's liability under the essential facilities doctrine, he must show (1) that Mercy Hospital controls emergency room and obstetrical care facilities that are essential to competition in the northern half of Montgomery County, Kansas; (2) his own inability to duplicate, practically or economically, the emergency room and obstetrical care facilities that Mercy Hospital controls; (3) a denial by Mercy Hospital of the use of its emergency room and obstetrical care facilities; and (4) the feasibility of Mercy Hospital sharing its emergency room and obstetrical care facilities without impairing its own ability to care for patients adequately. It is Dr. McKenzie's task to demonstrate the presence of all these elements of an essential facilities claim in the facts of this case. If even one element is absent, his argument under the doctrine is unavailing.

■ Perhaps the most telling evidence against Dr. McKenzie's allegation that Mercy Hospital's emergency room and obstetrical care facilities are essential to his practice of medicine are his own statements that express precisely the contrary. The most comprehensive of these appears first in Dr. McKenzie's Memorandum in Opposition to Mercy Hospital's Motion for Summary Judgment and again in his brief on appeal. Outlining the evidence and testimony Dr. McKenzie planned to present to demonstrate competition between himself and Mercy Hospital, the Memorandum explains:

> Once [Dr. McKenzie's expert witness] has laid the foundation for competition between hospitals and physicians in general in certain broad market areas, Dr. McKenzie is prepared to specify in which particular markets he competes directly with Mercy Hospital. *Doctor McKenzie has a substantial obstetrical care practice and in fact delivers infants in his office in Independence.* To the extent that Dr. McKenzie does not admit these obstetrical patients to Mercy Hospital, Mercy Hospital is denied a market for the provision of hospital facilities to those patients. This is direct and immediate competition. In addition, it is indisputable that Dr. McKenzie at one time had a substantial emergency room practice. *Since most emergency room visits are not in fact true emergencies, Dr. McKenzie is still competing with the emergency room to the extent that many of those patients could be treated by Dr. McKenzie in his clinic.* If they were to choose to go to Dr. McKenzie, instead of Mercy Hospital's emergency room, Dr. McKenzie would have the benefit of supplying them with ancillary services and supplies.

Record, vol. 2, at 239–40; Brief of Appellant at 21 (emphasis added).

As we have already explained, when reviewing a grant of summary judgment, a court of appeals construes disputed factual issues "in favor of" the party opposing the motion. This means that when the court examines the legal claim for which summary judgment has been granted, it adopts the opposing party's interpretation of the

factual circumstances that precipitated the claim. It does not mean, however, that the court is free to minimize the legal jeopardy that may attach to the opposing party as a result of that interpretation.

Accepting Dr. McKenzie's assertions that even after losing his staff privileges he still has a substantial obstetrical care practice and is still competing with the Mercy Hospital emergency room,[11] we conclude that Dr. McKenzie has failed to demonstrate the first of the *Hecht/MCI* criteria: that Mercy Hospital controls facilities essential to his medical practice of obstetrical and emergency care. Dr. McKenzie's appeal under Section 2 of the Sherman Act must therefore fail.[12]

The judgment of the district court is affirmed.

---

**11.** We also note that the district court found that "plaintiff's business has increased since the date he was denied staff privileges," record, vol. 1, at 132, a determination that Dr. McKenzie does not dispute on appeal.

**12.** In *Pontius v. Children's Hospital,* 552 F.Supp. 1352, 1370 (W.D.Pa.1982), the court declared that for public policy reasons, "the essential facilities doctrine is inapplicable to hospital staff privileges decisions." Whether the doctrine's *per se* rule *ought* to condemn termination of a physician's privileges is a question that must be answered only when all four criteria of the *Hecht/MCI* formula are satisfied. Because we conclude that Dr. McKenzie has failed to show that he was denied access to an essential facility, we do not address that question in this opinion.