951 F.2d 1558
 1991-2 Trade Cases P 69,651
 M. Hisham TARABISHI, M.D., and M. Hisham Tarabishi, Inc.,
individually and doing business as TMD Out-Patient
Medical Center and Tarabishi Medical
Center, Plaintiffs-Appellants,
Cross-Appellees,
v.
McALESTER REGIONAL HOSPITAL, also known as McAlester
Regional Health Center Authority Public Trust Status; the
McAlester Clinic, Inc.; Leroy M. Milton, M.D.; George
Brown, M.D.; William G. Blanchard; Samuel E. Dakil, M.D.;
John B. Cotton, M.D.; Steven Atwood, M.D.; Charles K.
Holland, M.D.; Karl Sauer, M.D.; Hertzl V. Schaff, M.D.;
Joe McCauley, M.D.; and Don Schuller, M.D.,
Defendants-Appellees, Cross-Appellants.
 Nos. 89-7056, 89-7063.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 10, 1991.
 
 Frank Gregory, Tulsa, Okl. (James C. Lang, Kevin C. Leitch, and G. Steven Stidham of Sneed, Lang, Adams, Hamilton & Barnett, Tulsa, Okl., with him on the briefs), for plaintiffs-appellants, cross-appellees.
 George F. Short of Short, Barnes, Wiggins, Margo & Alder, Oklahoma City, Okl., for defendant-appellee, cross-appellant McAlester Regional Medical Hosp.
 Douglas J. Colton of Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, D.C. (Kevin Driskill and Cynthia L. Sparling of Short, Barnes, Wiggins, Margo & Alder, Oklahoma City, Okl., Joe Stamper of Stamper, Otis & Burrage, Antlers, Okl., for defendant-appellee, cross-appellant McAlester Regional Medical Hosp., Joseph F. Glass and Leigh Reaves of Thomas, Glass, Atkinson, Haskins, Nellis & Boudreaux, Tulsa, Okl., for defendants-appellees, cross-appellants McAlester Clinic and Individuals, with them on the briefs), for defendants-appellees, cross-appellants.
 Before ANDERSON, BALDOCK, Circuit Judges, and SAM,* District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Plaintiffs-appellants and cross-appellees, Dr. M. Hisham Tarabishi, M.D., and M. Hisham Tarabishi, Inc., appeal an adverse judgment following a nine-week trial to the court on plaintiffs' antitrust claims arising out of the termination of Dr. Tarabishi's medical staff privileges at defendant McAlester Regional Hospital. We affirm.
 
 BACKGROUND
 
 2
 Dr. Tarabishi is an ear, nose and throat doctor who practiced medicine in McAlester, Oklahoma from 1979 to 1985. M. Hisham Tarabishi, Inc. was an Oklahoma professional corporation whose sole shareholder was Dr. Tarabishi. Defendant McAlester Clinic, Inc. is an Oklahoma professional corporation composed at the time relevant to this case of approximately 17 or 18 shareholder physicians with a wide range of medical specialties. Defendant Hospital is a 200-bed facility located in McAlester, Oklahoma. It was established as a public trust hospital under Okla.Stat. tit. 60, §§ 176-180. Its beneficiary is the City of McAlester. It is the only hospital in McAlester, formed by the merger of two pre-existing hospitals. Other individual defendants are physicians, most of whom were members of the Clinic at the time relevant to this case, and a few of whom were not.[1] All had staff privileges at the Hospital.
 
 
 3
 Dr. Tarabishi joined the Clinic in 1979. Prior to that, he had practiced in Marshfield, Wisconsin, after completing his medical training at several different locations. He was granted full staff privileges at the Hospital when he began practice with the Clinic. After six months, differences apparently developed between Dr. Tarabishi and the Clinic concerning aspects of his employment, compensation and pension. The Clinic decided to terminate his employment, which it formally did in January, 1980. Dr. Tarabishi thereupon opened his own medical practice consisting of some general surgery, some ear, nose and throat surgery, and an office medical practice. His practice was, by all accounts, successful.
 
 
 4
 In 1982, Dr. Tarabishi explored the possibility of establishing an outpatient surgical clinic, to be called the TMD Center, which would have been the first such clinic in McAlester. He commissioned a feasibility study to examine whether such a clinic was needed. The study indicated the planned outpatient surgical clinic would be economically feasible.
 
 
 5
 In accordance with applicable Oklahoma law, Dr. Tarabishi prepared a Certificate of Need application so that his planned new facility would be appropriately licensed by the Oklahoma Health Planning Commission. He retained a health care industry consultant, Mr. Jerry Colclazier, to assist him in preparing the Certificate of Need application. In connection with that application, Mr. Colclazier conducted his own investigation of the need for an outpatient surgical clinic of the sort Dr. Tarabishi envisioned, as well as of Dr. Tarabishi's qualifications. After concluding that such a clinic was needed, and that Dr. Tarabishi had the capability of establishing and operating one, he prepared the Certificate of Need application, which was completed and filed on March 14, 1983.
 
 
 6
 In connection with the Certificate of Need application, Dr. Tarabishi sought from the Hospital a statement of neutrality regarding the application. The Hospital never adopted any such position of neutrality. It did, however, inform Dr. Tarabishi twice that its position was that it had no interest in the medical practice of a physician conducted in his own office.
 
 
 7
 At a February 1983 meeting of its Board of Trustees, the Hospital decided to open its own outpatient surgical department, to be opened on April 1, 1983. The minutes of a May 1983 meeting of the Hospital Board reflect that the Board then determined to oppose Dr. Tarabishi's Certificate of Need application, on the ground that the proposed facility would duplicate the hospital's surgical services. Among those speaking against his application at hearings before the Oklahoma Health Planning Commission were Ed Majors, the Administrator of the Hospital, Gary Brock, at that time the Assistant Administrator, Tom Giandrone, the Comptroller, and Dr. Leroy Milton, then a shareholder of the Clinic and a member of the Board of Trustees of the Hospital. Hospital Administrator Ed Majors argued that the proposed facility "would hurt MRH [the hospital] financially, by costing the Hospital substantial sums, including approximately $387,500 during the first year, $432,800 the second year and $472,000 the third year of TMD's operations." District Court Findings of Fact and Conclusions of Law at 13 (citing Plaintiffs' Ex. 25(a) at 5). The Certificate of Need was in fact granted in June 1983.
 
 
 8
 Meanwhile, the Hospital, as planned, opened up its own outpatient ambulatory surgical department in April, 1983, accompanied by an increased advertising campaign featuring, in part, the new department. During this same time frame--i.e. from April to June of 1983--the Hospital initiated several investigations into incidents involving alleged patient and case mismanagement and other improper or inappropriate behavior by Dr. Tarabishi. These resulted in investigations by various committees and boards between June 1983 and July 1984.
 
 
 9
 On May 24, 1984, the Hospital revoked Dr. Tarabishi's surgical and emergency room privileges, which meant that Dr. Tarabishi could no longer treat his patients in the Hospital's emergency room, nor could he perform surgery at the Hospital. The Hospital revoked all of Dr. Tarabishi's staff privileges on July 17, 1984, with the result that he could no longer use Hospital facilities for any purpose.
 
 
 10
 The TMD Center was finally completed in July, 1984. The Center commenced operation on July 9, 1984 and continued to operate until August 31, 1985, at which time it ceased operation and Dr. Tarabishi stopped practicing medicine in McAlester. Apparently, Dr. Tarabishi has since tried to resume his practice in Pennsylvania, but has been unable to obtain hospital privileges, due, in part, to the revocation of his privileges in McAlester by the Hospital.
 
 
 11
 The reasons for TMD's failure are disputed. Defendants assert that its economic structure was flawed from the beginning. Plaintiffs assert that it was the revocation of Dr. Tarabishi's staff privileges which caused the failure. As the district court found, a condition for the Oklahoma Planning Commission's grant of a license to the TMD Center was that TMD have access to the Hospital's emergency care facilities. This was because the Center was not equipped to deal with complex medical or surgical problems. Patients at the Center therefore needed access to the Hospital's facilities in the event that a complication or emergency developed. While Dr. Tarabishi had full medical staff privileges at the Hospital, the TMD Center complied with that condition. Upon the revocation of Dr. Tarabishi's Hospital staff privileges, TMD failed to be in compliance with that condition. However, in November 1984, Dr. Tarabishi and the Hospital entered into a "transfer agreement" pursuant to which TMD patients could be admitted to the Hospital if an emergency developed. Dr. Tarabishi could not, however, continue himself to treat patients after they were transferred to the Hospital. In any event, Dr. Tarabishi closed the TMD Center in August, 1985.
 
 
 12
 Dr. Tarabishi then brought this action, alleging a host of antitrust violations by defendants. Among defendants' affirmative defenses was immunity from the antitrust laws under the "state action" doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and subsequent cases, and under the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34-36.[2] After a nine-week trial to the court, defendants prevailed on all claims but their immunity claim. Plaintiffs timely appealed and defendants cross-appealed on the immunity issue.[3]
 
 DISCUSSION
 
 13
 We first consider the Hospital's and individual defendants' claim that the district court erred in finding they were not immune from the application of the antitrust laws under the Local Government Antitrust Act of 1984 ("LGAA"), 15 U.S.C. §§ 34-36.
 
 
 14
 The LGAA provides that "[n]o damages, interest on damages, costs, or attorney fees may be recovered under § 15, § 15(a) or § 15(c) of this Title from any local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 35(a). "Local government" is defined to include "a school district, sanitary district, or any other special function governmental unit established by State law." 15 U.S.C. § 34(1)(B). The Hospital claims immunity as a "special function governmental unit" and the individual doctors as employees or agents of that unit. The district court denied motions by the Hospital and the doctors for summary judgment on plaintiffs' claims for damages, concluding that, although it was a public trust hospital, the Hospital was not a "special function governmental unit" under the LGAA. It reiterated that conclusion in its final Findings of Fact and Conclusions of Law. We affirm.
 
 
 15
 The LGAA was enacted to give greater immunity to local governments. It was a legislative response to "an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in the public interest." H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, reprinted in 1984 U.S.Code Cong. & Admin.News 4602, 4603; see also Sandcrest Outpatient Servs., P.A. v. Cumberland County Hosp. Sys., Inc., 853 F.2d 1139, 1142 (4th Cir.1988). As indicated, the Act specifically provides that school districts and sanitary districts are special function governmental units entitled to immunity. The legislative history of the Act suggests others: planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts. Id. at 4620-21.[4] Hospitals, whether public trust hospitals or otherwise, are not specifically mentioned. Several courts have noted, however, that the Act is to be construed broadly. See Palm Springs Medical Clinic, Inc. v. Desert Hosp., 628 F.Supp. 454 (C.D.Cal.1986) (the court noted that "[t]he language of the 1984 Act is inclusive and not exclusive, defining a 'local government' as 'a school district, sanitary district, or any other special function governmental unit established by State law in one or more States.' ") Id. at 456 n. 2; see also Capital Freight Servs., Inc. v. Trailer Marine Transp. Corp., 704 F.Supp. 1190, 1198 (S.D.N.Y.1989) ("the language and legislative history of the LGAA is explicitly inclusive, not exclusive."). Further, we agree with the observation of the court in Capital Freight Servs., that Congress "rejected the commercial-governmental distinction, adopting a definition for eligibility for immunity based on status as a governmental instrumentality and effect on taxpayers rather than purpose." Id. at 1199.
 
 
 16
 Defendants assert that our recent decision in Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d 853 (10th Cir.1991), establishes the Hospital's immunity under the LGAA. Defendants further assert that the purpose of the LGAA was to permit local government entities to go about their business free of the threat of large antitrust damage awards, and that an award against the Hospital would obviously hurt McAlester. Finally, they rely upon a handful of cases holding that, under the laws of different states, certain hospitals were held to be special function governmental units.[5] Defendants assert that these facts bring the Hospital within the definition of a special function governmental unit for purposes of the LGAA.
 
 
 17
 Plaintiffs respond that Oklahoma law controls the question here, and thus the interpretation of the status of a hospital under the laws of other states is immaterial. Further, the mere fact that a judgment against the Hospital would hurt McAlester does not mean that the Hospital is a special function governmental unit with antitrust immunity. Finally, plaintiffs rely upon the fact that under the provisions of the Governmental Tort Claims Act, Okla.Stat. tit. 51, §§ 151, et seq., then in effect, public trusts operating hospitals were specifically excluded from the definition of "political subdivision" under that Act. In 1987, however, the Governmental Tort Claims Act was amended to specifically include public trusts operating hospitals within the definition of political subdivisions.
 
 
 18
 Defendants' reliance on Buckley Construction is misplaced. In Buckley, the plaintiff, a disappointed low bidder on a construction contract, alleged that one of the defendants, Shawnee Civic & Cultural Development Authority, had violated the antitrust laws in its award of the contract to the second lowest bidder on the project. While the Authority was indeed a public trust created pursuant to the same Oklahoma statutes which created the Hospital in this case,[6] its challenged conduct was undertaken pursuant to provisions of the Oklahoma Public Competitive Bidding Act, Okla.Stat. tit. 61, §§ 101-136. Those provisions were the ones relevant to the question of state action immunity under Parker v. Brown, 317 U.S. 341, 342, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and subsequent cases.[7] Thus, the fact that this court in Buckley found the actions of a public trust in awarding a construction contract pursuant to applicable competitive bidding statutes immune under the state action doctrine says nothing about whether a public trust hospital should be immune under the LGAA.
 
 
 19
 Further, the cases from other jurisdictions upon which defendants rely are distinguishable. In Sandcrest Outpatient Servs., P.A. v. Cumberland County Hosp. Sys., Inc., 853 F.2d 1139 (4th Cir.1988), involving a county hospital owned and operated by a nonprofit corporation created as an agency and instrumentality of the county, the plaintiff did not appeal the district court's conclusion that the nonprofit corporation which owned and operated the hospital was a governmental unit under the LGAA. Thus, the appellate court simply assumed that to be the case. Palm Springs Medical Clinic, Inc. v. Desert Hosp., 628 F.Supp. 454 (C.D.Cal.1986), upon which defendants place great reliance, involved a hospital district created pursuant to California Health & Safety Code §§ 32000, et seq. After extensively examining the legislative history of the LGAA, the court concluded that the hospital district was immune.[8] In Sweeney v. Athens Regional Medical Ctr., 705 F.Supp. 1556 (M.D.Ga.1989), the court held, without specific analysis but simply "[a]fter considering the relevant statutory authority," that a public hospital authority organized under the Georgia Hospital Authorities Law was a local government unit under the LGAA.[9] Id. at 1562. Similarly, a district court in Griffith v. Health Care Auth., 705 F.Supp. 1489, 1501 (N.D.Ala.1989) held that a health care authority was a "local government" under the LGAA.[10] Finally, in Wicker v. Union County Gen. Hosp., 673 F.Supp. 177 (N.D.Miss.1987), a public hospital owned and operated by a county was held to be a governmental agency.[11] None of these cases directly answers the question of whether a hospital operated as a public trust for furtherance of public functions with a city as its beneficiary should be considered a special function governmental unit. Cf. Zapata Gulf Marine v. P.R. Maritime Shipping Auth., 682 F.Supp. 1345, 1351 (E.D.La.1988) (court held that Puerto Rico Maritime Shipping Authority was special function governmental unit because statute creating it described it as a "governmental instrumentality of the Commonwealth of Puerto Rico," funds to cover an antitrust damage award against the Authority would come ultimately from the taxpayers, the creation and operation of the Authority "was necessitated by the inability of the private sector to meet the public's needs," and because the statute creating the Authority provided that the exercise of its powers "constitutes an essential governmental function."); Trustees of A.J. Bremen Realty Trust v. City of Boston, 1985-1 Trade Cas. (CCH) p 66,520, 1985 WL 6083 (D.Mass.1985) (court held Massachusetts Port Authority was a special function governmental unit because created as a public instrumentality and because the exercise of its powers were deemed to be an "essential governmental function."); Northeast Jet Ctr., Ltd. v. Lehigh-Northhampton Airport Auth., 767 F.Supp. 672, 680 (E.D.Penn.1991) (airport authority is special function governmental unit).
 
 
 20
 After carefully examining the relevant statutes and case law, we hold that the district court correctly determined that the Hospital is not a special function governmental unit. No single factor is determinative. Rather, two considerations guide our decision.
 
 
 21
 First, we agree with the district court that a significant consideration is where liability for an antitrust damage award will actually fall, in light of the LGAA's obvious concern to limit the imposition of treble damage awards on taxpayers. In this case, the City of McAlester is the beneficiary of the public trust, and as such is clearly not liable for any damage award made against the trust. Thus, the LGAA's concern about imposing unfair burdens on the taxpayers is not implicated.
 
 
 22
 Second, inasmuch as the question of the character of a local entity under the LGAA is a question of state law, we find it persuasive that around the time of the challenged conduct, the Oklahoma legislature clearly viewed public trust hospitals as entities different from political subdivisions. Indeed, under the provisions of the Governmental Tort Claims Act, Okla.Stat. tit. 51, § 152, immunity was granted to the "state, its political subdivisions, ... whether performing governmental or proprietary functions...." "Political subdivision" was thereafter defined as including a "municipality," a "school district," a "county," and "a public trust where a city, town school district or county is a beneficiary, provided, that for the purposes of this act, a public trust shall not include any hospital operating under a trust authority." Id. at 152(8). This clear exclusion suggests that the Oklahoma legislature at the time did not view public trust hospitals as entities comparable to municipalities, school district, or counties. While the Tort Claims Act's clear inclusion of public trust hospitals under its definition of political subdivisions since 1987 might suggest a different result today, we believe the former provisions indicate a conscious characterization of a public trust hospital under state law at the time relevant to this case.
 
 
 23
 Having affirmed the conclusion that defendants enjoy no immunity from damage claims under the LGAA, we turn to the merits of this case.
 
 
 24
 Plaintiffs alleged the following antitrust violations: (1) monopolization of surgical health care services by the Hospital; (2) monopolization of and attempt to monopolize non-surgical and office health care services by the Clinic; (3) conspiracy to monopolize by all defendants; and (4) conspiracy in restraint of trade by all defendants. The district court rejected all those claims.
 
 
 25
 1. Monopolization by Hospital.
 
 
 26
 Plaintiffs allege the Hospital monopolized the surgical health services market.[12] Apparently, as a part of this claim, plaintiffs assert that the Hospital violated the "essential facilities" doctrine by means of the revocation of Dr. Tarabishi's staff privileges, thereby denying him access to the Hospital's facilities which he argues are crucial to his practice.
 
 
 27
 The elements of monopolization under Section 2 are "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."
 
 
 28
 Reazin v. Blue Cross and Blue Shield, 899 F.2d 951, 973 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990) (quoting Bright v. Moss Ambulance Serv., 824 F.2d 819, 823 (10th Cir.1987) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966))). In this circuit, proof of monopoly power requires a showing of both power to control prices and power to exclude competition. Reazin, 899 F.2d at 967; Bright, 824 F.2d at 824; Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., 783 F.2d 159, 163 (10th Cir.1986). Determination of the existence of monopoly power requires proof of relevant product and geographic markets.
 
 
 29
 The district court found error with plaintiffs' proof of markets. More specifically, the court found there was insufficient evidence to prove the asserted markets. These are factual findings subject to the clearly erroneous standard of review. Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir.1986), cert. denied, 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988). Plaintiffs' expert, Dr. Joe Jadlow, testified that the relevant product market for the Hospital was the business of supplying surgical health care services. The relevant geographic market was defined as the area within a 30-mile radius of McAlester. The district court noted the following problems with the geographic market:
 
 
 30
 First, the geographic radius was derived from an examination of MRH [Hospital] discharge records, and a finding that 84% of its discharged patients lived within thirty miles of McAlester. As was pointed out on cross-examination, plaintiffs' expert did not take into account whether patients who lived within the 30-mile radius went elsewhere than MRH for surgical health care services. The "time factor" which might keep patients close to home was not quantified.
 
 
 31
 District Court Findings of Fact and Conclusions of Law at 25. The district court also criticized Dr. Jadlow's use of a bed count to measure the Hospital's market share in the market of surgical health care services.[13]
 
 
 32
 More fundamentally, the district court noted that plaintiffs simply failed to present any evidence about the Hospital's power to control prices, a critical element of proof of monopoly power in this circuit. Reazin, 899 F.2d at 967; Shoppin' Bag of Pueblo, 783 F.2d at 163. Indeed, as plaintiffs' expert, Dr. Jadlow, conceded, he had not examined whether the Hospital had evidenced monopoly power in its pricing. R.Vol. VI at 243, 249-50. Such a proof failure is fatal to plaintiffs' monopolization claims against the Hospital. Thus, we affirm the district court's conclusion that "a showing of monopoly power [by the Hospital] has not been made." District Court Findings of Fact and Conclusions of Law at 27. Plaintiffs' section 2 claims against the Hospital therefore fail.[14]
 
 
 33
 2. Monopolization and Attempt to Monopolize by Clinic.
 
 
 34
 To establish monopolization by the Clinic, plaintiffs must, as indicated, prove monopoly power. In their attempt to prove such power, plaintiffs' expert, Dr. Jadlow, defined the relevant product market as the business of supplying non-surgical and office surgery health care services. As with the Hospital, he defined the relevant geographic market as the area within a 30-mile radius of McAlester. He further opined that the Clinic had a 66% share of that market, based on the following analysis:
 
 
 35
 And I did this by looking to see what were the specialties of the physicians at the McAlester Clinic. I included those specialties in looking at the total number of physicians in the McAlester community, and I looked to see what proportion of that total group physicians the McAlester Clinic accounted for.
 
 
 36
 R.Vol. V at 24. The district court again noted the following problems with Dr. Jadlow's market determinations:
 
 
 37
 While defining the geographic market as a 30-mile radius, plaintiffs' expert focused only on doctors within McAlester itself. He did not consider doctors within the radius who did not practice in McAlester. A recurring theme in his testimony was that he focused solely upon the Clinic and the City of McAlester. Dentists who perform root canal work, for example, while appearing to fall within the language of plaintiffs' product market definition, were excluded solely because plaintiffs' expert did not believe such surgery was done at the Clinic. Regarding the proposed geographic market, plaintiffs' expert at one point characterized it as an approximation. However, it is clear that the actual geographic area studied was the City of McAlester itself. In sum, both as to product market and geographic market, the procedure of plaintiffs' expert varied from the actual proposed markets.
 
 
 38
 District Court Findings of Fact and Conclusions of Law at 27-28. We cannot say that these findings are clearly erroneous.[15]
 
 
 39
 Further, again as with the monopolization claim against the Hospital, plaintiffs presented no evidence of the Clinic's ability to exclude competition and to control price.[16] Absent such proof, we are compelled to conclude that plaintiffs' monopolization claim against the Clinic must fail.
 
 
 40
 Plaintiffs also charged the Clinic with attempted monopolization. The elements of that section two violation are:
 
 
 41
 (1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt.
 
 
 42
 Colorado Interstate Gas Co. v. Natural Gas Pipeline Co., 885 F.2d 683, 693 (10th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990); Shoppin' Bag of Pueblo, 783 F.2d at 161. Further "to satisfy the dangerous probability of success element of an attempt claim, the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff." Colorado Interstate Gas Co., 885 F.2d at 693. This is typically done by examining the defendant's market share in the relevant market. Id.
 
 
 43
 The district court, relying on its previous conclusion that plaintiffs failed to prove adequately the relevant markets, held that the first two factors were not established. We agree.
 
 
 44
 We further agree with the district court's alternative conclusion that the third factor--a specific intent to monopolize--was not established. While the evidence in this case may certainly have shown animosity towards Dr. Tarabishi, we must affirm the district court's conclusion that it failed to show a specific intent to monopolize.
 
 
 45
 In so holding, we reject plaintiffs' argument that defendants' legitimate and protected conduct[17] in opposing Dr. Tarabishi in the Certificate of Need application proceedings furnishes the requisite specific intent to monopolize.
 
 
 46
 3. Conspiracy to Monopolize.
 
 
 47
 Plaintiffs charged all defendants with various conspiracies to monopolize, in violation of section two. More specifically, plaintiffs argue there were three conspiracies: one between the Hospital and the Clinic; one between the Hospital and the physicians; and one between the individual physicians. The elements of such a claim are:
 
 
 48
 (1) ... a combination or conspiracy to monopolize; (2) ... overt acts done in furtherance of the combination or conspiracy; (3) ... a specific intent to monopolize; and (4) ... an appreciable effect upon commerce.
 
 
 49
 Dreiling v. Peugeot Motors of Am., Inc., 850 F.2d 1373, 1382 (10th Cir.1988); see also Bacchus Indus., Inc. v. Arvin Indus., 939 F.2d 887, 895 (10th Cir.1991). The district court held for defendants on this claim, noting again plaintiffs' failure to prove a specific intent to monopolize as well as their failure to establish a conspiracy. We affirm with respect to the lack of evidence of specific intent. The issue of conspiracy in this case is, as the district court acknowledged, more difficult. Because it is crucial to plaintiffs' section one claim, we discuss it in that context.
 
 
 50
 4. Conspiracy in Restraint of Trade.
 
 
 51
 Plaintiffs allege that defendants engaged in a conspiracy to boycott plaintiffs and in a conspiracy to stabilize prices, all, obviously, in restraint of trade. They claim that each of these conspiracies is a per se violation of section one. Alternatively, they charge that they violate section one under the rule of reason.
 
 
 52
 While noting that a group boycott has been held to be a per se violation of section one, the district court declined to apply the per se analysis to the claimed boycott in this case.[18] We agree with that determination.
 
 
 53
 A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anti-competitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive.
 
 
 54
 Northwest Wholesale Stationers, Inc. v. Pacific Stationery Printing Co., 472 U.S. 284, 298, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985); see also Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1412 (9th Cir.1991) ("the per se rule should be invoked for a group boycott when the challenged activity would almost always tend to be predominantly anticompetitive"). Denying staff privileges to a physician through peer review on the basis that the physician's conduct is unprofessional and inappropriate is not an activity "likely to have predominantly anticompetitive effects" such that per se treatment is necessary.[19]
 
 
 55
 The district court went on to apply the rule of reason analysis. In doing so, the court correctly noted that the first question is whether plaintiffs proved there was joint action sufficient to satisfy the requirement that there be a contract, combination or conspiracy. See McKenzie v. Mercy Hosp. of Independence, 854 F.2d 365, 367 (10th Cir.1988). In this case, the court specifically found that there was "no evidence, apart from the peer review process, that a conspiracy existed." District Court Findings of Fact and Conclusions of Law at 33. After noting that existing precedents do not completely answer the question of whether peer review by itself provides the requisite joint action or whether a hospital can conspire with its medical staff, the court held that, even assuming arguendo that joint action was established, plaintiffs once again simply failed to establish the required impact upon competition. Plaintiffs' failure to prove adequately the relevant markets within which competition was allegedly affected, and their failure to prove that Dr. Tarabishi's inability to use the facilities at the Hospital affected competition, as opposed to Dr. Tarabishi himself as a competitor, doomed plaintiffs' section one claims to failure.[20] We affirm. While plaintiffs might wish us to assume or infer an impact on competition based on the denial of Dr. Tarabishi's staff privileges, and the failure of his TMD center, the reality is that it is plaintiffs' burden to prove such an impact, and plaintiffs simply failed to do so here.
 
 CONCLUSION
 
 56
 For the foregoing reasons, the judgment of the district court dismissing plaintiffs' claims is AFFIRMED.
 
 
 
 *
 Honorable David Sam, United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 The individual defendants are as follows, with their area of medical specialty as indicated: Leroy Milton, M.D. (internal medicine); George Brown, M.D. (general surgery); William Blanchard, M.D. (general surgery); Samuel Dakil, M.D. (ear, nose and throat); John Cotton, M.D. (family practice); Steven Atwood, M.D. (internal medicine/emergency medicine); Charles Holland, M.D. (internal medicine); Karl Sauer, M.D. (general surgery); Joe McCauley, M.D. (family practice); and Don Schuller, M.D. (radiology). Defendants Milton, Brown, Blanchard, Dakil, Cotton, Atwood and Holland were members of the Clinic. Additionally, Milton and Holland were both members of the Hospital's Board of Trustees during the time relevant to this case. In May 1984, Milton became "Chief of Staff" at the Hospital. Defendants Sauer, Schaff, McCauley and Schuller were not affiliated with the Clinic. Plaintiffs named as non-defendant co-conspirators four other doctors who practice at the Hospital
 
 
 [2]
 Defendants do not appear in this appeal to argue they are entitled to state action immunity
 
 
 [3]
 There is a pending motion to dismiss the cross-appeal for failure to file it timely. The facts relating to this motion are as follows: Under Fed.R.App.P. 4(a)(3) the notice of cross-appeal was due on June 19, 1989. In fact, it was filed on June 20. Upon learning that it had been filed late, defendants/cross-appellants filed a motion for extension of time in which to file the notice. Included was an affidavit from defendants' counsel, which stated that the notice had been mailed to Muskogee, Oklahoma from Tulsa, Oklahoma on June 16, and that in counsel's experience mail between those two cities took at most two days. Defendants also relied upon Fed.R.App.P. 4(a)(5), asserting that their late filing was due to "excusable neglect." Plaintiffs/cross-appellees filed a response arguing that the "excusable neglect" standard had not been met in this case and defendants filed a reply. The district court granted defendants' motion for an extension of time, applying it nunc pro tunc to the notice of appeal filed June 20. We review that conclusion only for a clear abuse of discretion. See Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc., 371 U.S. 215, 83 S.Ct. 283, 9 L.Ed.2d 261 (1962); Romero v. Peterson, 930 F.2d 1502, 1505 (10th Cir.1991)
 Plaintiffs/cross-appellees first argue that the district court applied the wrong standard by inquiring whether defendants demonstrated "good cause" rather than "excusable neglect." We disagree. An examination of the district court's order makes it clear that the court applied the "excusable neglect" rather than the "good cause" standard.
 More importantly, the motion to dismiss requires us to decide whether the district court properly found excusable neglect in the circumstances of this case. Noting the broad discretion granted the district court in making that determination, we deny the motion to dismiss the cross-appeal. In denying the motion, however, we remind the parties that we would still consider the issue raised in the cross-appeal--whether defendants had any immunity from the application of the antitrust laws--because defendants may raise any ground for upholding the favorable judgment they received below. See In re Robinson, 921 F.2d 252, 253 (10th Cir.1990); Koch v. City of Hutchinson, 847 F.2d 1436, 1441 n. 14 (10th Cir.) (en banc), cert. denied, 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).
 
 
 [4]
 The list of other types of units entitled to immunity actually comes from the House Report on the predecessor bill to the Act, which had defined "local government" as a "city, county, parish, town, township, village, school district, sanitary district, or any other general or special purpose political subdivision of one or more States."
 
 
 [5]
 See Sweeney v. Athens Regional Medical Ctr., 705 F.Supp. 1556, 1561-62 (M.D.Ga.1989); Griffith v. Health Care Auth. of the City of Huntsville, 705 F.Supp. 1489, 1501 (N.D.Ala.1989); Wicker v. Union County General Hosp., 673 F.Supp. 177, 186 (N.D.Miss.1987); Palm Springs Medical Clinic, Inc. v. Desert Hosp., 628 F.Supp. 454, 456-57 (C.D.Cal.1986)
 
 
 [6]
 The Hospital was formed as a trust for furtherance of public functions under 60 Okla.Stat. §§ 176-180. The City of McAlester owns the land upon which the Hospital is located and leases it to the Hospital. Its trustees are public officers, appointed by the mayor of McAlester, and they must take the oath of office required of elected public officials. 60 Okla.Stat. § 178(A). Meetings of the trustees are subject to the open meeting laws like other public boards and commissions. Id. at § 178(C). The Declaration of Trust which created the Hospital stated that the Hospital was created for the benefit of the city of McAlester and that the purpose of the trust was to provide hospital and public health services to the residents of McAlester. Defendants' Ex. 155D, Addendum of Appellees/Cross-Appellants at Tab D. However, as the district court noted, a public trust in Oklahoma is a separate legal entity from its beneficiary. See State v. Garrison, 348 P.2d 859, 863 (Okla.1959). Hospital employees are not city employees. Further, as the district court also noted, 60 Okla.Stat. § 179 makes it clear that any judgment against the Hospital would be satisfied out of the trust estate, and the beneficiary (the city of McAlester) would not be liable
 Defendants also argue that in Dr. Tarabishi's section 1983 action against the Hospital and its trustees arising out of the same facts, this court held that the Hospital and its trustees were acting under color of state law for section 1983 purposes. Tarabishi v. McAlester Regional Hosp., 827 F.2d 648, 652 (10th Cir.1987). That determination is not, however, dispositive of whether the actions of the Hospital and its trustees are entitled to immunity as those of a special function governmental unit and its officials or employees. Cf. Ezpeleta v. Sisters of Mercy Health Corp., 800 F.2d 119, 122 (7th Cir.1986) (per curiam) (even though antitrust claim is barred by state action doctrine, section 1983 claim is unavailable because there is no state action in decision to terminate physician's staff privileges).
 
 
 [7]
 Immunity under the LGAA was apparently not an issue in Buckley
 
 
 [8]
 We note that recently, however, the Ninth Circuit has ruled that a hospital district is not immune under the state action doctrine, without specifically discussing immunity under the LGAA. Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397 (9th Cir.1991)
 
 
 [9]
 Under the applicable Georgia law, the authority "operates as a not-for-profit public corporation and is 'deemed to exercise public and essential governmental functions and shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of [the Hospital Authorities Law].' " Sweeney, 705 F.Supp. at 1561 (quoting Ga.Code Ann. §§ 31-7-75, 77 (1985))
 
 
 [10]
 The health care authority was established pursuant to the Health Care Authorities Act of 1982, Ala.Code §§ 22-21-310, et seq., which provided, inter alia, that such authorities "act[ ] as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state." Ala.Code § 22-21-318(c)(2)
 
 
 [11]
 The court held "the Hospital and its board [of trustees] are themselves governmental agencies. The trustees on the board are appointed to limited terms by elected representatives of the people." Wicker, 673 F.Supp. at 186
 
 
 [12]
 In their Complaint and Amended Complaint, plaintiffs appeared to charge the Hospital with attempted monopolization as well. The district court did not address such a claim in its Findings of Fact and Conclusions of Law, and plaintiffs do not appear to pursue it in their appellate briefs
 
 
 [13]
 The district court stated "[t]he mere words of the plaintiffs' market definition denote more than the provision of a hospital bed." District Court Findings of Fact and Conclusions of Law at 25. The district court also concluded that Dr. Tarabishi, as a provider of surgery or surgical services to his patients, was neither a competing provider nor a consumer of "surgical health care services." Similarly, the court concluded that TMD was neither a competitor nor a consumer in the market of surgical health care services, because TMD did not have beds, the measure by which the Hospital's market share in the surgical health care services market was determined
 
 
 [14]
 As indicated, plaintiffs argue mightily that the "essential facilities" doctrine was violated in this case. This court explored that doctrine in McKenzie v. Mercy Hosp. of Independence, 854 F.2d 365, 369 (10th Cir.1988):
 Though the Supreme Court first employed the essential facilities doctrine to condemn the conduct of multiple defendants under Section 1 of the Sherman Act, the doctrine has since been applied in cases brought under Section 2 and in which only a single entity controls the necessary facility.
 More recently, the federal courts of appeals have adopted standards to determine whether a monopolist's refusal to deal constitutes a violation of the essential facility doctrine under Section 2. In MCI Communications Corp. v. American Tel. and Tel. Co., 708 F.2d 1081, 1132-33 (7th Cir.), cert. denied, 464 U.S. 891 [104 S.Ct. 234, 78 L.Ed.2d 226] (1983), the court held that to establish liability under the doctrine, the plaintiff must show: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the facility; (3) the denial of the use of the essential facility to a competitor; and (4) the feasibility of providing the facility."
 Id. at 369 (citations omitted). This court went on to note, however, that a district court had "declared that for public policy reasons, 'the essential facilities doctrine is inapplicable to hospital staff privileges decisions.' " Id. at 371 n. 12 (quoting Pontius v. Children's Hosp., 552 F.Supp. 1352, 1370 (W.D.Pa.1982)). See also Castelli v. Meadville Medical Ctr., 702 F.Supp. 1201, 1209 (W.D.Pa.1988), aff'd, 872 F.2d 411 (3d Cir.1989) ("This court is in full agreement with the consistent decisions of other courts not to apply the essential facilities doctrine to exclusive service contracts by hospitals."). The McKenzie court did not address that issue because it concluded that, even if the doctrine were to apply, the plaintiff had failed to show that he was denied access to an essential facility.
 Were we to apply the doctrine to this denial of staff privileges case, we would hold that it fails as a section two claim because plaintiffs failed to establish that the Hospital or any other defendant is a monopolist. To the extent plaintiffs argue the defendants conspired to deny them access to an essential facility in violation of section one, we would hold, as this court did in McKenzie, that plaintiffs were not denied an essential facility.
 If we analyze the two plaintiffs separately, plaintiffs' failure to prove an essential facility becomes clearer. Plaintiffs themselves assert that it was the TMD Center which was the alleged primary competitive threat to defendants. For the TMD Center, however, Dr. Tarabishi's access to Hospital facilities was not essential, because in November 1984 the TMD Center and the Hospital entered into a transfer agreement pursuant to which TMD patients had access to the Hospital. As for Dr. Tarabishi himself, his argument that he was denied an essential facility proves too much, for it amounts to an argument that a hospital can never deny a physician staff privileges, because restricting the practice of that physician always, in some sense, reduces competition. Yet Dr. Tarabishi has not proved that restricting his own access to the Hospital, apart from the TMD Center, diminished competition in a meaningful antitrust sense.
 
 
 [15]
 Plaintiffs make a multi-pronged attack on the district court's conclusions with respect to market definition. It is difficult to respond to all aspects of this attack, because many of them are obscure. Suffice it to say that we bear in mind that it is plaintiffs' burden to prove relevant markets. Thus, plaintiffs' attack on defendants for "fail[ing] to show why medical care consumers from Pittsburgh County may sometimes travel to other locations" is beside the point. Further, proof of markets is required so that adverse impact on competition can be evaluated. Thus, plaintiffs' markets must bear some relation to plaintiffs' theory of harm to competition. Plaintiffs in this case have failed in that respect
 Plaintiffs belatedly attempt to remedy their failure to plead and prove relevant markets by citing FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), where the Supreme Court stated, " 'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' " Id. at 460-61, 106 S.Ct. at 2018-19 (quoting Areeda & Turner, Antitrust Law, p 1511 (1986)); see also Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1413 n. 10 (9th Cir.1991); Reazin v. Blue Cross & Blue Shield, 899 F.2d 951, 968 n. 24 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). What plaintiffs fail to realize, however, is that the "proof of actual detrimental effects" requires more than the simple allegation that the closure of TMD and the cessation of Dr. Tarabishi's practice reduced competition. As we have explained previously, what plaintiffs have never shown is that consumer choices were in fact reduced or impaired by the denial of staff privileges to Dr. Tarabishi. See n. 14, supra.
 
 
 [16]
 Indeed, as defendants point out, what evidence there was on this point suggests the opposite conclusion. At the same time Dr. Tarabishi left the Clinic, another doctor also left and set up an independent practice as an internist/cardiologist in competition with the Clinic. His independent practice was very successful
 
 
 [17]
 Plaintiffs do not seriously dispute that defendants' activities in the Certificate of Need application hearings were protected under the Noerr/ Pennington doctrine. See United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)
 
 
 [18]
 In doing so, the court relied on Weiss v. York Hosp., 745 F.2d 786 (3d Cir.1984), cert. denied, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985), in which the court applied the per se rule to a contention that a hospital's refusal to grant staff privileges to osteopathic physicians constituted a boycott or concerted refusal to deal. The Weiss court noted, however, that:
 The Medical Staff is, however, entitled to exclude individual doctors, including osteopaths, on the basis of their lack of professional competence or unprofessional conduct. If York's policy toward D.O.'s could be viewed as a form of industry self-regulation of this type, the rule of reason, rather than a per se rule, would be applicable.
 Id. at 820 (citation omitted); see also Miller v. Indiana Hosp., 843 F.2d 139, 144 n. 6 (3d Cir.) ("in a hospital staff privilege case in which the hospital defends on lack of professional ability, the rule of reason test would apply"), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). Because defendants in this case terminated Dr. Tarabishi's staff privileges at least ostensibly because of a lack of professional competence or unprofessional conduct, we agree with the district court that Weiss does not dictate the use of per se analysis.
 
 
 [19]
 The district court similarly rejected per se treatment of plaintiffs' conspiracy to stabilize prices claim. We affirm, and we further affirm the district court's conclusion that there was "no evidence of such a price stabilization conspiracy, whether directly or through the effect of the peer review proceedings." District Court Findings of Fact and Conclusions of Law at 40
 
 
 [20]
 The district court noted that "the only impact upon competition, as distinguished from plaintiffs, is based upon the speculation that TMD would ultimately become a hospital. The Court finds this speculation to be tenuous." District Court Findings of Fact and Conclusions of Law at 39. While it is true that there was an area--the provision of out-patient surgery--in which the Hospital arguably did compete with TMD, plaintiffs never quantified the impact on competition in that market