**Todd D. HERMAN, Plaintiff,**

v.

**RAYTHEON AIRCRAFT COMPANY, Defendant.**

**No. 99–1199–JTM.**

United States District Court, D. Kansas.

June 1, 2000.

---

**1250**

Daniel J. Sevart, Sevart & Sevart, Wichita, KS, for Todd D. Herman.

Terry L. Mann, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, for Raytheon Aircraft Co.

## *MEMORANDUM ORDER*

MARTEN, District Judge.

This is an action by plaintiff Todd Herman, suing under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., after defendant Raytheon withdrew a provisional offer of employment as a sheet metal assembler. Currently before the court is Raytheon's motion for summary judgment. Because the court finds that the present matter turns on a credibility determination involving conflicting witness testimony, summary judgment must be denied.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dis-

pose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 1. Findings of Facts

Herman applied for a sheet metal assembler position with defendant on March 31, 1998. He did not have any prior experience as an aircraft sheet metal assembler, but he had recently taken the sheet metal training class at Wichita Area Technical College in the evenings. He interviewed with two Raytheon supervisors, and met with Shirley Winters, who works as one of the defendant's staffing representatives. Herman was given a conditional job offer, contingent on his passing the drug test, background check, and physical examination.

Herman applied for an opening in Raytheon's JPATS program. The JPATS is a very small aircraft with two seats, one behind the other. Due in part to the size and configuration of the aircraft, performing the duties of a sheet metal assembler on the JPATS aircraft requires working in awkward and uncomfortable body positions for lengthy periods of time, and the frequent and extended use of vibratory tools. The job duties also require repetitive heavy grasping,squeezing, pulling, bending, twisting, and crawling.

As part of his physical examination, Herman was asked about his medical history. He disclosed that he had had bilateral carpal tunnel surgery in 1990.

Herman was given a Nerve Pace test, which measures the time it takes for an electrical stimulus to pass through the median nerve to the thumb. A latency period of 4.4 milliseconds is at the upper limit of normal. In accordance with the Nerve Pace Operating Manual, Raytheon's practice is to take five latency readings on each hand, to arrive at an average reading. Herman's latency period for his right hand

was 6.0 milliseconds, and for his left hand was 5.8 milliseconds.

Plaintiff stresses the testimony of Dr. Anthony G.A. Pollock, M.D., a board certified orthopedic surgeon, who had performed Herman's carpal tunnel repair, that he had never heard of such a machine, and could not attest to its reliability, indicating that had he known of it he probably would have "poohpooed the thing as some kind of quack black box." (Pollock Depo. Attachment 3, at 26–27). In addition, plaintiff cites the testimony of Wanda Roehl, Raytheon's Workers Compensation Manager, who stated that the machine is "somewhat of a crude test," and that Raytheon has subsequently added another test. (Roehl Depo., Att. 6, p. 38–39).

The plaintiff overplays Dr. Pollock's reaction to the Nerve Pace monitor, to the extent that it suggests he felt the device was unreliable. In fact, he was wholly noncommittal on the subject Asked if he had "any opinion as to whether or not it is reliable or unreliable," Dr. Pollock responded "none." (Pollock Depo., Def. Exh. 17, at 9). After stating that he was not sure whether other physicians used the device, and that he had never seen one, Dr. Pollock stated: "I could not comment on the validity of the test one way or the other." (Id., at 10). Dr. Pollock in his deposition explicitly states he could not attack the validity or usefulness of the Nerve Pace monitor. Roehl's testimony also deserves fuller context. She testified that "although [the Nerve Pace monitor] is somewhat of a crude test, we have seen good correlation to the entire test, which is like a nerve conduction test." (Roehl Depo., Def. Exh. 16, at 39). There is no evidence that the Nerve Pace monitor, used in conjunction with other elements of a physical examination, is medically unreliable.

Herman authorized release of his medical records. It is uncontroverted that those records indicated he had had severe bilateral carpal tunnel syndrome, and that after more conservative treatment was un-

successful, he had surgery for the condition in 1990. Herman's personal physician, Dr. Anthony Pollock, attributed the carpal tunnel condition to Herman's work at Sharp Construction. The records also indicated that in 1996, Herman saw Dr. Ronald Davis, complaining of chronic lumbosacral pain, with right upper posterior leg radiation. Dr. Davis, in a form completed September 30, 1996 released Herman to return to work with a restriction of no pushing, pulling, or lifting more than 50 to 60 pounds. (Def.Exh. 13). No other restrictions were placed on Herman's return to work.

After reviewing Herman's medical history and the duties of the job being offered, Raytheon's ergonomist Dawn Wilson concluded that Herman "would not be able to perform these job tasks in light of his current restrictions." (Plf.Exh. 9). Dr. John F. McMaster, the company physician, likewise recommended alternative work. Roehl, the Workers Compensation Manager, stated there "would be concern that, yes, that he would have problems doing" the sheet metal job, which involves "very intense vibratory tool work." (Def. Exh. 16, at 40).

Based on the recommendations of its ergonomist and Dr. McMaster, Raytheon withdrew the conditional offer of the sheet metal assembler position.

Herman does not believe that his prior carpal tunnel syndrome, which was treated in 1990, or his 1996 back pain have any substantial effect on his ability to work, walk, see, hear, speak, breathe, learn, or care for himself. But he has testified that he believes Raytheon's company doctors thought he was substantially limited in his ability to work. However, it is uncontroverted that the only evidence he has to support this conclusion is that the company doctor recommended he not be placed in a JPATS sheet metal assembler position.

When the offer was rescinded, Herman went to see his personal physician, Dr. Anthony Pollock, who had performed Herman's carpal tunnel surgery in 1990. Dr. Pollock was not involved in the treatment for Herman's chronic lumbosacral pain, as that was a work-related injury. Dr. Pollock interviewed Herman on April 23, 1998, and noted that he thought Herman would be able to perform the duties of the job for which he was applying.

Dr. Pollock did not perform any nerve conductivity testing as part of his examination of Herman. Dr. Pollock admits that, when Herman was previously suffering from bilateral carpal tunnel that was so severe that surgery was required, he was not able to detect it except through nerve conductivity testing. In his deposition, Dr. Pollock stated that he did not perform any nerve conductivity testing as part of his examination of Herman because his physical examination indicated no need for such testing. Upon learning that nerve conduction studies showed severe bilateral carpal tunnel syndrome, Dr. Pollock stated, "Shows a bilateral carpal tunnel syndrome severe, which is really quite surprising." (Def.Exh. 12).

There is a fact dispute as to whether Herman sent Dr. Pollock's notes to Shirley Winters at Raytheon. Herman states that he did. Winters denies ever seeing them. Dr. McMaster testified that he never saw Dr. Pollock's notes either.

Dr. Pollock could not recall in his deposition whether Herman told him about the position he had applied for, what the job duties of the position were, or what tools were required to be used to perform the job. What Dr. Pollock actually said was that he had no "independent recollection." (Pollock Depo., Att. 3, p. 11, 11.5–B).

Dr. McMaster testified that, even had he received Dr. Pollock's notes as to his belief that Herman could perform some unspecified job duties at Raytheon, that opinion would not have altered his recommendation that Herman not be placed in a sheet metal assembler position. Dr. Pollock testified that he would have no basis on which to disagree with Dr. McMaster, the compa-

ny physician who was familiar with the job duties and tools.

When asked if there was any kind of work that Herman would not be well suited for, Dr. Pollock testified that he would be reluctant to have Herman working in a position that required the use of vibratory tools. Dr. Pollock has treated many patients with carpal tunnel syndrome who were sheet metal workers, and concedes that there is probably a higher rate of carpal tunnel syndrome among aircraft sheet metal workers than in the general population. Pollock believes that use of vibratory tools can contribute to recurrence of carpal tunnel syndrome after surgery. He also testified that it "wouldn't make much sense" to put Herman in a job that required frequent grasping, squeezing, twisting, and pounding. The sheet metal assembler job in JPATS requires frequent and extended use of vibratory tools, as well as repetitive heavy grasping, squeezing, pushing, pulling, bending, twisting, crawling, crouching, kneeling, and stooping.

At the time Herman applied for work with Raytheon, he was employed as a foreman by Sharp Construction Corp., a company primarily owned by Herman's father. Herman has worked for Sharp Construction since 1988, and has been a foreman since 1994. Since the time of Herman's application for employment with Raytheon, he has continued in his employment at Sharp Construction.

The wage offered to Herman by Raytheon was $11.00 per hour. In his employment at Sharp Construction, Herman earns a salary of $750 per week, or $39,000 per year. That annual salary computes to $3,250 per month.

Herman contends that Jackie Sanford, a supervisor in the JPATS program, told him he would be working 72 to 80 hours per week. He also states that a male supervisor named Tom Haynes told him the same thing. Ms. Sanford denies making such a statement. Even assuming that Herman had been told he would be work-ing this amount of time (2080 hours of overtime a year), it strains credibility to believe that he would have actually wound up working that amount of time. Greg Birney, another sheet metal assembler hired at approximately the same time, worked 321.7 hours overtime in 1998, and 599 hours in 1999.

If Herman had gone to work for Raytheon, a regular 40-hour week at the rate of $11.00 per hour would result in a weekly income of $440 and a monthly income of $1,760, or $1,490 less per month than he earns at Sharp Construction. To even equal his salary at Sharp Construction, Herman would have had to work more than 90 hours of overtime per month for Raytheon (overtime rate of $16.50 times 90.30 hours equals $1,489). Herman contends that he is entitled to a back pay award of $25,000.

Considered on a weekly basis, Herman would earn $39,000 per year at Sharp Construction ($750 per week for 52 weeks). He would earn $22,880 per year at Raytheon ($440 per week for 52 weeks). The difference between the two annual incomes of $16,120 annually ($39,000 - $22,880 = $16,120). To achieve the same income at Raytheon as he was earning at Sharp, Herman would have had to earn an additional $16,120 in overtime, representing some 977 hours of overtime.

Herman also claims $300,000 in compensatory damages. The basis for this assertion is that Herman believes he is entitled to recover damages for day care expenses for two of his children. He asserts that he would have saved money on childcare by working second shift for Raytheon. Herman does not explain how he could plan to care for his children for half a day, while working up to 40 additional hours of overtime per week.

Herman applied for an opening created by job requisition 651–815. That requisition called for five sheet metal assemblers. When Herman did not get the JPATS sheet metal assembler position, other applicants were hired instead. The payroll

records of a person who was hired for a JPATS sheet metal assembler position (Greg Birney) demonstrate that Herman's expected overtime of 32 to 40 hours per week is greatly overstated. Gary Birney had 321.7 hours of overtime work in 1998 and 522 hours of overtime work in 1999.

Raytheon contends that it does not regard Herman as being unable to perform jobs other than JPATS sheet metal assembler. There are several other positions that Herman could perform, including tool crib attendant, stock attendant, expediter, inspector, sealer, shop status clerk, or sanitation worker. Herman would not be restricted from an assembly position on the Hawker Horizon line, because the job duties are different for that aircraft. However, there is a fact dispute as to whether Herman was told of the alternative work. According to Herman, interviewer Shirley Winters told him that, with his restrictions, there were no positions for him at Raytheon. Winters has testified that she would never tell an applicant he would not be considered for another position.

Herman is no longer interested in working for Raytheon and would not accept a position if one were offered. He has decided that he will buy out his father's interest in Sharp Construction, the company for which he has worked since 1988. Herman expects that, as majority owner of Sharp Construction, his income will increase over what it is currently. Herman seeks a back pay award of $25,000, a front pay award of $67,500, compensatory damages in the amount of $300,000, and unspecified punitive damages.

But for Herman's history of carpal tunnel syndrome, Dr. John F. McMaster, one of Raytheon's physicians in March of 1998, would not have recommended the restrictions which resulted in Raytheon's recision of the job offer in question. Dr. McMaster would not have recommended alternative work for Herman had Herman never suffered from carpal tunnel or back problems. Dr. McMaster's reason for recommending restrictions which disqualified

Herman from employment at Raytheon was "To protect him from further injury, impairment and disability as it relates to those two diagnoses...." (McMaster Depo., Plf. Exh. 5, p. 31). Herman was examined by a company doctor, but not by Dr. McMaster. Dr. McMaster never examined Herman, and had never met Herman prior to the doctor's deposition.

Raytheon determined that Herman was qualified for the position in question by training and experience. The restrictions placed on Herman would disqualify him from more positions than just the sheet metal assembler job on JPATS. However, there were various other jobs which Herman could have performed, including crib attendant, stock attendant, expediter, inspector, sealer, sanitation worker, shop status clerk, and even sheet metal assembler jobs on different aircraft.

Herman alleges that Raytheon considered him as unable to work at virtually any position with Raytheon. There is, however, no evidence as to this point other than Herman's own testimony that he was told he could not perform any work at Raytheon.

Herman stresses that, in connection with his ongoing work at Sharp Construction, he successfully performs certain work requiring the use of vibratory hand tools frequently and for extended periods, and his duties require heavy grasping, squeezing, pulling, lifting, bending, and twisting. Raytheon argues that Herman's experiences as a foreman in the construction company do not resemble the duties of a sheet metal assembler working in the restricted spaces of a JPATS product, that Herman uses vibratory tools only when they are performing sheeting functions or doing some iron work, and that both Herman and his physicians had attributed his prior experience with severe bilateral carpal tunnel syndrome to the work he performs for Sharp Construction.

### 2. Conclusions of Law

■ Herman's claim under the ADA is restricted: he does not allege that he falls

within either of the first two prongs of section 12112(a) of the statute (i.e., that he has an impairment or has a record of an impairment); he argues only that he falls within the ADA because he was regarded as having an impairment substantially limiting one or more major life activities. Raytheon's motion is directed at two points: (1) that Herman does not have a valid claim under the ADA under the Supreme Court's recent treatment on the subject (*Sutton v. United Airlines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)), and (2) Herman's claims for back pay and front pay must be dismissed.

Under *Sutton* and the subsequent Tenth Circuit decision in *Long v. City of Leawood,* 2000 WL 14257 (10th Cir.2000), in order to fall within the "regarded as" impaired as to the major life activity of working, there must be proof that the employer considered the plaintiff unable to perform a class of jobs or a range of jobs in different classes—not just a particular job. There is evidence in the record from which a rational fact-finder could conclude that Raytheon effectively disqualified Herman only from certain heavy jobs such as sheet metal assembler, not from a class of jobs. However, Herman has testified directly that he was told he wasn't fit for *any* job at Raytheon. The person who allegedly told him this, Shirley Winters, denies it. Given the controlling standards relating to summary judgment, Raytheon's motion must be denied.

Raytheon has also responded with an affidavit by Raytheon Human Resources Director Nita Long stating that, if Winters did make such a comment, it is not Raytheon's policy and was outside the scope of Winter's employment. As to this last point, the court finds it is insufficient to nullify what is otherwise a clear fact dispute. The fact remains that, if Herman is believed, he was told he wasn't fit for any work at Raytheon, which places him within the "regarded as" prong of the ADA.

■ Raytheon's second argument is directed at Herman's claimed damages. It argues (A) that Herman wasn't entitled to back pay, because he earned a lot more at his current job—so much so that he would have to work an incredible number of overtime hours at Raytheon to even break even, let alone accumulate any right to back pay; and (B) he is not entitled to front pay since he has chosen to stay at his current job and has refused reasonable offers to come to work for Raytheon. Following Raytheon's motion, Herman has abandoned his front pay claim. However, he still argues that he can show he is entitled to back pay.

The figures relating to Herman's salary are presented above, and while it may seem doubtful that Herman would in reality have wound up working so much overtime, again, this is something that cannot be decided by summary judgment. Herman testified that he was told he would be permitted to work an amount of overtime which might permit him to make a claim of back pay, and the court will not grant summary judgment on the issue.

IT IS ACCORDINGLY ORDERED this 1st day of June, 2000, that the defendant's motion for summary judgment (Dkt.No.38) is hereby denied.