**VAN SCHAACK LAND COMPANY, Plaintiff,**

v.

**HUB AND SPOKE RANCH COMPANY and Jess M. Sun, Defendants.**

**No. 01–1227–JTM.**

United States District Court, D. Kansas.

Feb. 10, 2003.

Joseph H. Cassell, Larry D. Ehrlich, Frank J. Kamas, Terry D. Smith, Render Kamas, L.C., Wichita, KS, for Hub and Spoke Ranch Co., Jess M. Sun.

Peter G. Collins, James Z. Hernandez, Woodard, Hernandez, Roth & Day, Wichita, KS, for Brown Nagel & Hiser, LLC.

Patricia M. Dengler, Brown, Dengler, Good & Rider, L.C., Wichita, KS, for Henderson Partners, Ltd., Edmond Henderson, James Henderson.

Timothy J. Finnerty, Teresa J. James, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, for Yvonne Wade Nagel, PC, Yvonne W. Nagel.

Richard C. Hite, F. James Robinson, Jr., Hite, Fanning & Honeyman, L.L.P., Wichita, KS, for Van Schaak Land Co.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

The plaintiff Van Schaack Land Company, a real estate broker and agent, has brought the present action for breach of contract and fraud against its former client, Hub and Spoke Ranch Company and its president, Jess M. Sun. The defendants have moved for summary judgment as to both claims, while the plaintiff has moved for partial summary judgment seeking a determination that the defendants breached the contract. Having reviewed the pleadings, the court finds that the controlling fact questions are undisputed. The court will deny defendants' motion and grant the motion of the plaintiff.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting

the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial.**'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Plaintiff Van Schaack Land Company was founded in 1934 or 1935 by Henry C. Van Schaack. In 1950, Paul "Bud" Dawkins was hired as a salesman for Van Schaack. He is currently the president of Van Schaack. Kent Dawkins is the vice president of Van Schaack. At all material times Van Schaack Land Company was a Kansas licensed broker and Paul Dawkins was the supervising broker.

Defendant Jess Sun is president of Hub & Spoke Ranch Company, a Wyoming Corporation. In 1999, Hub & Spoke was the owner of the T Bar Ranch located in Sherman and Wallace Counties in Kansas.

Before Hub and Spoke bought the T Bar Ranch, it sold its 110,000 acre ranch near Alcova, Wyoming. At one time the Alcova ranch spanned 1,640,000 acres. Over the years, Sun has been involved in perhaps eight or ten real estate transactions. Following the sale of the Alcova ranch, Hub and Spoke began looking for other ranches to buy.

Hub and Spoke turned to Van Schaack for brokerage services. Through Van Schaack, Hub and Spoke made offers to purchase four other ranches before it bought the T Bar Ranch. In 1998 Hub and Spoke purchased the T Bar Ranch for $3,000,000; Van Schaack brokered the deal.

Equitable Life Assurance Society of America provided funds for the purchase of the T Bar Ranch totaling $1,500,000, and it took a mortgage on the ranch. Lend Lease Agri–Business, Inc., has a contract with Equitable Life to service the loan. Vern George of Lend Lease's Denver, Colorado office originated and serviced the loan. He reports to Charles Prince, a regional vice president in the St. Louis Service Center of Lend Lease.

On June 7, 1999 Sun called Paul Dawkins and said that he would sell the ranch for $4,000,000. Sun was motivated to sell the ranch because he was

> getting really busy with our sign company [Sunstreet Technologies LLC, a company founded by Sun to manufacture electronic signs for the trucking industry] and it was taking a lot of my time and it was taking a lot of money, and it has a lot of promise, it's starting to do well now and I was to the point I was getting spread too thin.

(Sun Dep. at 96). Further, his wife "hated it there." (Id. at 67). Sun was using income from the T Bar Ranch to support Sunstreet Technologies.

At some point in the Fall of 1999 Sun ran into Paul Dawkins at a stock show in Denver. They discussed listing the ranch for a short period of time based on an asking price of $4,000,000.

In October 1999 Paul Dawkins told Sun that Chris Knox from South Dakota was interested in seeing the ranch. Paul and Kent Dawkins showed the ranch to Knox on November 2, 1999.

While at the ranch on November 2, 1999 Van Schaack and Hub and Spoke entered into an "Exclusive Right–to–Sell Listing Contract" on a preprinted form approved by the Colorado Real Estate Commission. The T Bar Ranch was listed with Van Schaack for a period of ninety days beginning on November 1, 1999 and ending on February 1, 2000.

According to Sun, after the November 2, 1999 listing contract:

> And then we had some developments happen in our sign company where we needed some capital pretty quick and I called Paul and I asked him, I said what's going on with your buyer. He said, well, he's really interested, I think he's going to make an offer every day and, you know, that's an answer I got out of Paul a lot later on. And I said Paul, I'll tell you what, if you can get three and a half million dollars for this ranch in the next week I'll sell it. I said I'm getting overwhelmed here and we need an injection of capital into this business and it's going to make a lot more money than this ranching business will and if I could get three and a half in the next week, I said call your guy up and say get off dead center, if he's wanting to buy it he can make the steal of the century this week only. Kent made the comment, well, we don't want to show that there's any blood on the water. I said, Kent, there isn't any blood on the water. This is the deal, three and a half million this next ten days and I'll sell it, but if we don't do it by then I'm going to have to do something else and I'm no longer interested in doing that. Well, they didn't get anything done and it all just went away.

(Sun Dep. at 68–69).

On November 22, 1999 Paul Dawkins sent Sun an Exclusive Right–to–Sell Listing Contract.

On January 6, 2000 while Sun was in Denver for a meeting involving Sunstreet, he and his partner in Sunstreet went to Paul Dawkins's office to discuss the Listing Contract. Sun read the November 2, 1999 and November 22, 1999 Listing Contracts before signing them. The Listing Contracts appeared to Sun to be similar to ones he had entered into in the past. He understood that the Listing Contract had legal consequences, and that if he signed the Listing Contract he would be bound by its terms and conditions.

Sun inserted additional terms at § 28 of the Listing Contract. He signed the Listing Contract on January 6, 2000 in Paul Dawkins's office.

Under the contract, Hub and Spoke agreed to pay Van Schaack 5% of the gross sales price of the property as a commission. The Contract provides that "Seller agrees to conduct all negotiations for the Sale of the Property only through Broker, and to refer to Broker all inquiries received in any form from real estate brokers, salespersons, prospective buyers, tenants or any other source during the time this Listing Contract is in effect." (Dep. Exh. 2, at § 3).

Section 6 of the Listing Contract states:

> Price and Terms. Price: U.S. $ *4,000,000.00* Terms: *Cash or terms acceptable to Seller.* Minimum amount of earnest money deposit U.S. $ *100,000* in the form of *Check.*

(Id. at § 6) (typewritten insertions shown *underscored* ).

Subsection 14(b) of the contract provides when the commission is earned:

> **When Earned.** Such commission shall be earned upon the happening of any of the following:

(1) Any Sale of the Property within the Listing Period by Seller, by Broker or by any other person;

(2) Broker finding a buyer who is ready, willing and able to complete the transaction as specified herein by Seller; or

(3) Any Sale of the Property within 180 calendar days subsequent to the expiration of the Listing Period ("Holdover Period") to anyone with whom Broker negotiated and whose name was submitted, in writing, to Seller by Broker during the Listing Period (including any extensions thereof); provided, however, that Seller shall owe no commission to Broker under this subsection (3) if a commission is earned by another licensed real estate broker acting pursuant to an exclusive right-to-sell listing contract or an exclusive agency listing contract entered into during the Holdover Period.

(Def. Dep. Exh. 1 and 2).

The contract defines a "sale" as "the voluntary transfer or exchange of any interest in the property or the voluntary creation of the right to acquire any interest in the property (including a contract or lease)." (Id. at § 3).

If Sun received an inquiry from a prospective purchaser he believed he had an "obligation to tell [Van Schaack] about them." (Sun Dep. at 80).

Van Schaack prepared a sales brochure, advertised the T Bar Ranch in various farm and ranch magazines, marketed the property through its various contacts, and showed the ranch to a number of prospective purchasers. These actions are summarized in the T Bar Ranch activity log, Paul Dawkins's calendar entries, Van Schaack's marketing correspondence file, and Kent Dawkins's calendar entries.

James Henderson is the general partner of Henderson Partners, Ltd., a Texas limited liability partnership based in Deavers, Texas, which owned three ranches in Texas spanning approximately 18,000 acres. His father, Edmond Henderson, is also one of the partners of Henderson Partners, Ltd.

After James Henderson became aware of the T Bar Ranch through J.D. Wilson, a friend of Jess Sun, he contacted Sun. Sun told him that Van Schaack had an Exclusive Right–to–Sell Listing Contract concerning the T Bar Ranch. However, Sun never told Henderson that the negotiations for the sale of the T Bar Ranch could only be conducted through Van Schaack, and never referred Henderson to Van Schaack. Henderson had no dealings with Van Schaack. While negotiating for the purchase of the T Bar Ranch, Henderson dealt only with Sun.

Henderson was shown the ranch several times. He is not certain of the exact date of the first showing, but he believes it occurred during the first quarter of 2000. Sun conducted the first showing and all subsequent showings of the ranch to Henderson.

Charles M. "Bud" Christensen of Gillette, Wyoming, is 81 years old and has ranches spanning approximately 130,000 acres in Wyoming, Montana, and Nebraska. On February 14, 2000 Christensen called Van Schaack about the T Bar Ranch, because of an ad he had seen. Van Schaack showed him the ranch on February 23, 2000.

Later, Kent Dawkins knew that Christensen visited the T Bar Ranch by himself. He had several telephone conversations with Christensen during the month of March 2000 during which Christensen expressed interest in the ranch.

On March 24, 2000, Paul and Kent Dawkins met with Sun for lunch at a restaurant in the Denver area to discuss the

progress of Van Schaack's marketing activities. According to Kent Dawkins, Sun did not mention James Henderson by name at the meeting, but he said that "some people from Texas wanted to see the ranch" and Kent Dawkins replied, "fine." (Kent Dawkins Dep. at 29). However, Paul Dawkins testified that Sun did name Edmond Henderson at the meeting, and said that the Hendersons were coming to town. Sun told the Dawkinses that he would let them know when the Texas people wanted to be shown the ranch.

On April 1, 2000 Sun called Paul Dawkins. Sun told him that Edmond Henderson and his son wanted to see the T Bar Ranch. There are two versions of how Sun came to conduct the showing of the property. According to Dawkins, he responded, "fine, we'd like to show the ranch," but Sun said, "No, I can do it for you, you don't have to make the trip." Sun insisted on conducting the showing. (Paul Dawkins Dep. at 141). Dawkins testified

> Jess Sun and our company had a great relationship prior to all of this. And I trusted this man implicitly, that if he didn't want us there, I took his word for it that he didn't want us there. But we should have been there, but he informed me he did not want us there, therefore, we stayed and honored his request.

(Id. at 363–64). He testified that Sun promised to "stay in touch." (Id. at 146). However, according to Sun, Dawkins asked Sun to show the property since he had another showing that day. (Sun Dep. at 96).

The day after Sun showed the ranch to the Hendersons, he told Paul Dawkins that the Hendersons "had a serious interest in the ranch."

Christensen wanted his son Bob to see the ranch, because he didn't want "to make an offer and saddle [Bob] with something he didn't want." (Christensen Dep. at 42).

However, it was difficult to arrange a trip to Kansas to see the ranch because his son was so busy at the time. On April 9, 2000 Christensen and his son drove almost 500 miles to see the ranch the next day.

While Christensen was visiting with Sun at the ranch, Christensen recalls that,

> [Sun] held up his two fingers and he says "I just came that close to making a deal." And it wasn't made, and my assumption was it wasn't made at that time, and that was a day that—that was April 10th, we asked who the people were, and he told us they were from Beaumont, Texas, and didn't give us a name, we didn't ask for a name especially, and but, that's—that was our conversation with Jess. . . . And as we looked around that day, there was some alfalfa on a pivot over there, and we noticed it had been seeded to triticale at that time. And we didn't think Jess would be seeding it to triticale unless he had a commitment of some kind.

(Christensen Dep. at 12–13). Christensen did not sense that Sun harbored any ill-feelings toward him, and thought he could make a deal with Sun.

Sun disclosed to Van Schaack his need to lease the ranch, "until I could find a way to work out my tax troubles . . . I just couldn't take a $600,000 hit and until I could figure a way to get around that, I was going to lease it." (Sun Dep. at 129). Kent Dawkins told Sun to "hold off leasing the ranch." (Id. at 117–18).

As of April 15, 2000 Hub and Spoke leased the pasture to Krutzinger Cattle Company through January 15, 2001 for a rental rate of $225,000 to be paid in two installments due on April 20, 2000 and November 1, 2000.

Christensen submitted a verbal $3,500,000 offer to Kent Dawkins. He offered to write a check for the $100,000

earnest money deposit, assume the Equitable Loan, and pay the balance with cash. He stated he could close within "a month or two." (Christensen Dep. at 10; Kent Dawkins Dep. at 48). However, one problem for Christensen was that Hub and Spoke had already leased the pasture for 2000 and Christensen had not negotiated with Sun as to how that would be handled. The Christensen offer was not contingent on the sale of any other properties.

Paul and Kent Dawkins presented Christensen's $3,500,000 offer to Sun on April 26, 2000 at the T Bar Ranch. During the April 26 visit Sun "threw [Christensen's offer] right out and said, there's no use, I don't want to sell it to him." (Paul Dawkins Dep. at 159). Sun said something to the effect that "he didn't like Mr. Christensen, was going to throw him off the ranch" and that he "would not sell this ranch to Mr. Christensen under any conditions." (Id. at 188). Paul Dawkins told Sun that Christensen would pay another $50,000. Sun responded that if Christensen "offered the complete purchase price he would not sell this ranch to Bud Christensen" and said "I don't like the SOB." (Id. at 191).

During the April 26 visit Sun asked whether Van Schaack had a written offer from Christensen. Dawkins replied, "no, it was a verbal offer." (Id. at 269). Sun did not counter Christensen's offer and he did not ask the Dawkinses for an offer in writing. Dawkins did not request a written offer from Christensen, because Sun said he would not sell the ranch to Christensen.

Sun discovered a tax problem approximately two weeks after the Christensen offer was submitted. He believed that if the $1,400,000 Equitable Loan was paid off, Hub and Spoke would have a significant tax liability.

At some point after the Hendersons were shown the ranch, but before the Purchase and Sale Agreement was signed, James Henderson told Sun that "he was pretty sure they would be interested at say, 3–5, or 3–550, something like that." (Sun Dep. at 142–43). However, Henderson never offered $3,550,000.

Sun believes that, "I might have told Bud that we might have had that conversation but Henderson's word—had indicated they were interested in that 3–350 range but I told Hendersons that wouldn't buy the ranch." (Sun Dep. at 143).

James Henderson denies that he ever suggested a possible offer of $3,500,000.

On May 22, 2000 Sun called Paul Dawkins and Dawkins noted on his calendar that Edmond Henderson of Beaumont, Texas had offered $3,550,000. During this conversation Sun said, "I don't know whether I can sell or not with my tax problem." (Paul Dawkins Dep. at 373). Sun told Paul Dawkins on May 22 that Henderson's offered price was insufficient. He couldn't do anything about the Henderson offer until he worked out his tax problem.

Paul Dawkins understood from Sun that this tax problem would exist with respect to any offer by any buyer. He asked Sun if he could "get in touch" with Henderson and "help with the negotiations." Sun replied, "No, he could handle it." (Paul Dawkins Dep., at 148–49). Paul Dawkins never asked Sun to explain why he did not want the Dawkinses to contact Henderson, because "I trusted the man with regards to this situation." (Id. at 149). Likewise, Kent Dawkins felt comfortable with Sun's instruction to not contact the Hendersons, because "we were protected under the listing agreement, so I had no fear what might have happened." (Kent Dawkins Dep. at 83–84).

Although he is uncertain of the precise date, Sun recalled a conversation he had

with Paul Dawkins in which Dawkins asked about how things were going with the "Texas people," and Sun replied that he believed they were going to make an offer, but Sun told Dawkins, "Bud, you know, I can't do anything about it until I work these tax problems out." (Sun Dep. at 150–52). Dawkins asked about how the things were going with the tax problems. Sun told him "we're working on it all we can do." (Id).

On May 23, 2000 Sun first met with his certified public accountant, Dennis Howard of Porter, Muirhead, Cornia and Howard of Casper, Wyoming for a "preliminary brainstorming" session about the tax consequences of a possible sale of the ranch. Sun outlined a possible sale to Henderson for the sum of $3,750,000 with a down payment of $450,000. This included a note for $1,440,000, leaving Section 1031 property which they would like to find replacement property for of $1,860,000. He said that the closing of the Henderson sale was set for September 1, 2000, and asked whether it would be prudent to change the closing to November 1, 2000 since Hub and Spoke's fiscal year end was October 31, 2000. Howard told Sun he would need to do some research, because "that was the first time that he had ran that by me." (Howard Dep. at 9) To the best of his recollection he gave no advice to Sun on May 23.

Sun's attorney, Yvonne Nagel, now known as Yvonne Wade, of the law firm Brown, Nagel, Waters & Hiser of Laramie, Wyoming prepared a Purchase and Sale Agreement for the sale of the T Bar Ranch to Edmond Henderson. On May 24, 2000 Bruce Waters of Brown, Nagel, Waters & Hiser transmitted a draft of the Purchase and Sale Agreement to Edmond Henderson. By May 25, 2000 Nagel's law firm had also transmitted to Henderson a draft Real Estate Sales Contract. The Real Estate Sales Contract (Dep.Ex. 66) was intended to be used with the Purchase and Sales Agreement (Dep.Ex. 63).

Nagel prepared the draft Real Estate Sales Contract (Dep.Ex. 66), to avoid a payoff of the Equitable Loan at the closing of a possible sale to Henderson:

In the Real Estate Sales Contract, on page 3, paragraph 1C, there's a reference to payment of 1.440 million, which was the Equitable loan. It was the balance due on the loan. It was contemplated that the loan would remain intact and the payments under the real estate sales contract would essentially be wrapped and would be—be paid toward the Equitable note. Subsequent provisions, including paragraph 2 on that page, continuing on, came directly from the Equitable note. So these payment provisions were identical to the Equitable note.

(Wade Dep. at 92–93). The Real Estate Sales Contract avoided the tax consequence of an assumption of the Equitable Loan; under the installment payment concept of the Real Estate Sales Contract tax liability would only accrue as the note was paid.

At the time the draft Purchase and Sales Agreement and draft Real Estate Sales Contract were submitted to Henderson, Wade believed that Sun was aware of and understood the terms and conditions of both agreements.

On May 30, 2000 Sun called Paul Dawkins. There is a dispute as to the subject of the call. According to Dawkins, Sun said "There is a possibility of selling the ranch to the Hendersons and what would you take as your commission if this should happen now." (Paul Dawkins Dep. at 84–85). According to Sun, the subject of the call was a possible offer by the Christensens. (Sun Dep. at 167–68). It is uncontroverted that Paul Dawkins asked for a day to think about Sun's query.

Sun cannot recall the precise date, but at some point he telephoned Paul Dawkins and told him "I just got a bomb dropped on me about the tax implications of this deal." (Sun Dep. at 121). Sun asked if he paid Van Schaack's expenses if they could take the ranch off the market. After Dawkins refused, Sun "told him that I was going to have to take the ranch off the market. I could not take that kind of tax hit." (Id. at 123).

The following day Paul Dawkins called Sun, and offered to accept a $100,000 commission. Sun rejected the offer. He testified that Dawkins

> was not willing to work with me one iota about my tax problems. It did not matter to him and he made that very clear. And if you've been doing a lot of business with somebody and you feel like they're your friends, you don't want to do business with those folks anymore. He didn't give a darn about the fact that I was going to have to pay big taxes.

(Id. at 259). Sun made no counter proposal to Dawkins's $100,000 offer.

After Sun rejected the $100,000 offer, Paul Dawkins thought that the Henderson deal "went away," because "We felt that Sun, with this problem, tax problem, as he stated to us, that he would not sell this ranch and didn't want to sell the ranch." (Paul Dawkins Dep. at 285, 293). Kent Dawkins also assumed that the Henderson offer "was over with." (Kent Dawkins Dep. at 58, 127).

As of the May 30, 2000 telephone conversation, Paul Dawkins was not aware of any negotiations between Henderson and Sun, and still trusted Sun because "we'd been friends for a long time. We had business deals together, and I trusted Mr. Jess Sun implicitly." (Paul Dawkins Dep., p. 376).

It is unclear whether Paul Dawkins knew or suspected Sun might be negotiating with Henderson. At one portion of his deposition he denies any such knowledge or suspicion. (Id. at 285-85). However, elsewhere in his deposition, Dawkins was asked if there was "anything significant going on ... during the September to December time frame?" and responded that "we knew there was something going on between Sun and Hendersons." (Id. at 217). He also responded that "[w]e had a suspicion" that "Henderson was going to buy the ranch." (Id. at 218). As plaintiff notes, Dawkins has submitted a deposition corrections form which seeks to modify the responses to these questions on the grounds that he did not understand the time frame involved in the question, but this is a question that cannot be resolved on summary judgment.

According to Paul Dawkins, from May 30, 2000 through the end of the Listing Contract, Sun kept telling the Dawkinses "the ranch is off the market, I don't want to sell the ranch, I'm going to lease it, I can't sell it. So we assumed he had the tax problem and we accepted his word on that—his statement." (Paul Dawkins Dep. at 286). Defendants attempt to controvert this by noting testimony by Sun that "I never told them it was off the market." (Sun Dep. at 265-66). However, it is apparent from the question directed at Sun that the inquiry was whether he made any such representation during the course of a meeting in January 2001. That Sun's comments cannot be taken to mean that he made no such representation during the entire history of the relations between the parties is further established by the explicit failure of the defendants to controvert Plaintiff' Fact ¶ 238, which includes the allegation that Sun subsequently told Dawkins "the ranch was off the market." Finally, even as to the earlier January meeting, Sun acknowledges that he told the Dawkinses that "until I had my tax problems worked out completely, I wasn't go-

ing to do anything with [the ranch]." (Sun Dep. at 265–66).[1]

At some point between May and August 2000, Dennis Howard was satisfied that the Real Estate Sales Contract proposed by Nagel was the proper structure to avoid the tax consequence of paying off the Equitable Loan. The Purchase and Sales Agreement between Hub and Spoke and Edmond Henderson was fully executed by June 2, 2000. The Agreement described a purchase price of $3,850,000, including a $100,000 earnest money deposit to be delivered to Western State Bank as escrow agent "upon the execution of the Agreement." (Plf. Exh. 67, at H223, ¶ 10). A closing date for the Henderson sale was set on November 10, 2000. Henderson was entitled to possession on September 1, 2000. The sum of $1,440,000, the amount due on the Equitable note, was to be paid under the terms of an attached Real Estate Sales Contract.

On June 1, 2000, James Henderson called Steven West of the Western State Bank in Goodland, Kansas and said "we want to deposit $100,000 into the bank as a good faith deposit on a real estate transaction." (West Dep. at 5–8). Western State Bank received a copy of the Purchase and Sales Agreement. West noted that ¶ 19 designated Western State Bank as the escrow agent to receive the earnest money deposit.

After West reviewed the Purchase and Sales Agreement, he believed that it set forth the essence of a typical escrow arrangement and, therefore, did not prepare an additional escrow agreement. On June 1, 2000 Western State Bank opened account No. 7692400518 in the name "Western State Bank Escrow for Hub and Spoke Ranch and Henderson Ltd." (West Dep. Exh. 1 (Deposit Agreement)).

On June 2, 2000 Henderson Partners, Ltd. made a wire transfer of $100,000 to the Western State Bank, which was deposited in account No. 7692400518.

Sun never informed Van Schaack of the June 2, 2000 Purchase and Sales Agreement.

On June 15, 2000 Van Schaack presented to Sun a written contract to purchase the T Bar Ranch for $3,800,000 from the Badly Scattered Cattle Company and the Bar S Family Partnership, Ltd. ("the Smiths"). The Smith offer included a contingency that Smith had to sell an existing ranch prior to closing on the T Bar ranch.

On Sunday, June 18, 2000 Sun met with Paul Dawkins in Dawkins's office. Sun told Paul Dawkins that he could not sell the ranch to the Smiths because of the tax problem.

On July 13, 2000 Teeters Abstract in Goodland, Kansas issued an owner's policy title commitment for Edmond Henderson in the amount of $3,850,000.

On July 18, 2000 Sun went to Dawkins's office to pick up a copy of the Listing Contract, because Sun couldn't find his copy. During this visit there was a brief discussion about the Smith offer. Sun said he had rejected it because it was less than the asking price.

Hub and Spoke formally rejected the Smith offer by way of a July 18, 2000 letter from Yvonne Nagel stating that "the contract contains contingencies not acceptable to the seller." (Dep.Exh. 18). Sun does not know whether anyone ever explained to Van Schaack what contingencies

---

1. Plaintiff stresses that the question preceding this response relates to a January 2001 meeting with the Dawkinses, which would have been after the term of the Listing Contract.

However, after answering the question in the negative, Sun continued his answer to state he "never" said the ranch was off the market.

in the contract Hub and Spoke found unacceptable.

Nagel has testified she believed, as of the date of the letter to the Smiths, that if the Henderson sale closed within the listing period, Van Schaack would be entitled to a commission. She also believed that if the sale closed in January 2001, within thirty days after the expiration of the Listing Contract, Van Schaack would still be entitled to a commission.

In a letter dated July 20, 2000 the Smiths' broker raised the offer to the full asking price of $4,000,000. The letter said, "The initial contract will need to be revised in regards to dates, price, and final earnest money deposit of 5% of the selling price. Everything else in the contract shall remain the same." (Dep.Exh. 19). The letter further stated that the offer would terminate at 5:00 p.m. MDST on July 26, 2000. Yvonne Nagel in a July 26, 2000 letter rejected the Smith revised offer.

When Kent Dawkins tried to speak with Jess Sun about the Smith revised offer all he got was "delay, delay, delay." (Kent Dawkins Dep. at 53–54). Finally, after he rejected the Smith Revised Officer, Sun told Kent Dawkins that he could not sell the ranch.[2]

Once Sun told the Dawkinses he could not sell the ranch, "it was during that time period when we got no feedback from these offers, and he said he had the tax problems and couldn't sell it, that when we, you know, Van Schaack slowed down on the marketing." (Kent Dawkins Dep. at 76). Nevertheless, Van Schaack attempted to keep the Smiths interested in the ranch.

·· On August 1, 2000, Henderson's Houston attorney Albert S. Weycer of Weycer, Kaplan, Pulaski & Zuber, P.C., sent Nagel a proposed First Amendment to Purchase and Sales Agreement, which extended the inspection period to October 2, 2000 and the closing date to January 16, 2001. It stated: "Except as herein modified, all other terms and conditions of the agreement shall remain in full force and effect." (Dep. Exh. 72 at ¶ 4).

Sun admits that he never informed Van Schaack of the First Amendment. By August 2, 2000 Nagel had not disclosed to Van Schaack the existence of the Henderson contract, and she did not know whether Sun had disclosed to Van Schaack its existence. She believed that if she disclosed the Henderson contract she would violate the attorney-client privilege.

On August 3, 2000 Henderson Partners, Ltd., loaned Sunstreet $100,000. The loan was payable on or before the earlier of: (1) the closing of the Henderson contract, or (2) one year.

On August 3, 2000 Nagel sent Sun the following fax concerning her communications with Van Schaack's attorney, Perry Warren, of Goodland, Kansas:

Here is a draft letter which I propose we send. If I keep harping on the lack of a qualified offer, maybe they will not press the matter of an agreement outside of the listing agreement. This is one issue which I don't think is going to go our way. His remedy in mediation would be a commission on the Henderson sale, when it closes. As an alternative, you could offer him a lesser

---

**2.** Defendants attempt to refute this fact by noting a two-page August 7, 2000 letter from Sun's attorney which includes a statement that "If you present Mr. Sun with a signed offer to purchase under the terms contained in the listing agreement, he will entertain the offer." (Dep.Exh. 24). Whatever the letter may have represented about Sun's willingness to "entertain" offers, defendants provide nothing to controvert the explicit testimony that, in direct conversation between Sun and Kent Dawkins, Sun stated that he could not actually sell the ranch.

fee, say payable when you receive the second lease installment.

If he would take 100k, I think you should settle it. You negotiated the 112 back from the Hendersons. If he brings in a bona fide offer, the fee will be 200k. You still end up ahead. He has said he would accept 100k. I would simply say you will pay him that at closing, if he packs his bags.

Sorry we couldn't put more pressure on him, as I originally was thinking.

(Wade Dep., at 177; Dep. Exh. 99).

Attached to the August 3, 2000 fax was a draft letter that Nagel eventually sent to Perry Warren on August 7, 2000. In the August 7 letter Nagel stated:

Clearly, the relationship between our respective clients has disintegrated to a point beyond repair. I understand that Mr. Sun has offered to reimburse Mr. Dawkins for his out of pocket expenses, and offered an additional $10,000 in order to terminate his principal/agent relationship. Particularly in light of the developments over recent weeks, it appears the termination of the relationship would be advisable. If there are terms under which your client would consider such a termination, please advise.

(Dep.Exh. 23).

At the time of the August 7, 2000 letter there was "some consideration" of disclosing to Van Schaack the existence of the Henderson contract, but "it was decided not to do that." (Wade Dep. at 127).

On August 10, 2000 Nagel faxed the following message to Sun:

I just wanted to remind you to consider settling this matter with the listing broker before we close the Henderson deal, or he gets wind of it.

Under the listing agreement, you had a responsibility to refer any purchaser or lessor to him. You didn't do that, and we have discussed buying him out of the contract for several months. You

can probably do that for a lesser price than the full commission if you do it before closing. If you do it after closing and he finds evidence of the sale in the public records or by any other method, you may potentially be liable for the full commission.

These listing agreements stink in terms of how they marry you to a broker, but if you can get out of this for $100,000 or less now, you will certainly save money down the road, when he finds out. And he will find out at some point.

(Dep.Exh. 100).

The next day, Nagel sent a letter to Perry Warren in which she offered Van Schaack a commission on the April 15, 2000 Krutzinger Lease:

The grass lease in no way constitutes a sale of the ranch, however, if this is the way Mr. Dawkins wishes to approach this matter, perhaps Mr. Sun should offer him six percent of the grass lease fee. I will discuss this with my client in more detail. The listing fee on this basis would be substantially less that [sic] what has been offered previously by Mr. Sun to resolve this matter.

(Wade Dep. Exh. 6). Nagel believed she had the authority to offer the 6% commission on the lease. Although she states she no longer believes it to be true, at the time Nagel wrote the August 11 letter she believed the lease was an event of sale that would trigger a commission under the Listing Contract.

On September 8, 2000 Nagel sent the following letter to Warren:

Hub and Spoke's Grazing Lease against which your client has threatened a claim for commission, expires on January 15, 2001. In addition, the current Lessee, Krutzinger Cattle Company, has indicated an interest in leasing the property for another term. The listing

agreement with your client does not expire until December 31, 2000.

Under the strict terms of the listing agreement, I have advised Mr. Sun that he has an obligation to notify you of the contacts which have been made by this party, even though the lease would be outside of the term of the listing agreement. Further, I have advised Mr. Sun that he has an obligation to notify you of the rent which was paid to him under the existing grazing lease. $112,500.00 was tendered upon execution of the agreement in April, and the final installment of $112,500.00 is due on November 1, 2000.

A copy of the lease is attached. I believe this constitutes sufficient notice of the grazing lease arrangement under the terms of the listing agreement. If you are in disagreement, please advise. While your client arguably has a claim for commission against the 2000 lease, which would be $13,500.00, I have advised Mr. Sun that I do not believe a claim for commission may be made against the renewal lease, if one is successfully negotiated, as that is outside the term of the listing agreement.

It is necessary for Mr. Sun to finalize arrangements with Krutzinger prior to the execution of the listing agreement. As such, I have advised him to make this disclosure. Please advise of your client's intentions. Of course, in the meantime, Mr. Sun remains open to a purchase offer executed by a fully qualified purchaser.

(Dep.Exh. 8).

Nagel agrees that the essence of the September 8 letter is that the only marketing activity that had occurred during the listing period, which was required to be disclosed under the Listing Contract, were the contacts with Krutzinger Cattle Company.

Concerning the September 8 letter Kent Dawkins testified as follows:

Q: All right. Finally, refer to Exhibit 8, please.

A: This is a good one.

Q: Why do you say that?

A: Well, she's advising Mr. Sun to notify us that he has an obligation to notify you of the contacts which have been made regarding the lease, but she didn't advise him that, you know, he had the obligation to disclose the negotiations with the Hendersons. Why didn't she do that?

Q: Sorry. I get to ask the questions. All right. Is there anything you believe that Miss Nagel said here that she knew was false at the time other than what you've said, you know now in retrospect that she knew there was the Henderson contract at the time and didn't disclose it?

A: No, just what I said. I think this whole letter is a device to get us off and—and take this—you know, get us off the deal.

Q. Okay. And again you think that it's misleading because it didn't ask you about the—didn't tell you about the Henderson contract.

A: Absolutely.

(Kent Dawkins Dep. at 131–32)

On September 26, 2000 Al Weycer, Henderson's Houston attorney, submitted to Nagel a Second Amendment to Purchase and Sales Agreement. Weycer wrote that the Second Amendment was "necessary as I have not heard from you concerning my September 7, 2000 correspondence to you which included the exchange provisions." (Dep.Exh. 25). The Second Amendment extended the Inspection Period to November 1, 2000. It also provided: "Except as herein modified, all of the terms and conditions of the Agree-

ment, as first modified by the First Amendment, shall remain in force and effect." (Dep. Exh. 67 at H250).

On October 1, 2000 Nagel wrote to Weycer, stating

> Finally, Al, I am not trying to avoid you or be inattentive to this matter. As your client knows, Mr. Sun also is trying to clarify the position of the listing broker with regard to certain obligations under a listing agreement which expires at the end of this year. Obviously, I would prefer having that matter resolved before my client enters into any further agreements, but on the other hand, Mr. Sun does want to move forward with this as quickly as possible.

(Dep.Exh. 16).

On October 30, 2000 Weycer submitted to Nagel a Third Amendment to the Purchase and Sales Agreement, which extended the Inspection Period to December 1, 2000. It also provided: "Except as modified herein, all other terms and conditions of the Agreement, as modified by the First Amendment and Second Amendment, shall remain in full force and effect." (Dep. Exh. 67 at H254).

On November 13, 2000 Henderson Partners, Ltd. loaned Sunstreet an additional $50,000. Dep. Exh. 78.1 This note, like the earlier note, was payable at the closing of the Henderson sale, or within one year, whichever was sooner.

On December 1, 2000 Weycer submitted to Nagel a Fourth Amendment to the Purchase and Sales Agreement, which extended the Inspection Period to December 15, 2000. He wrote:

> Please note that, unless we receive your client's executed Fourth Amendment by 5:00 p.m. CST today, my client may decide to terminate the subject Agreement in order to protect its earnest money. This is not their desire, but it would be beneficial if you would have your client execute the extension and fax

it back to me in a timely fashion as specified above.

(Dep.Exh. 82). The Fourth Amendment provides: "Except as herein modified, all other terms and conditions of the Agreement, as modified by the First Amendment, the Second Amendment and the Third Amendment, shall remain in full force and effect." (Dep. Exh. 67 at H257).

Sun admits that he never informed Van Schaack of the Second, Third, or Fourth Amendments.

On December 6, 2000, pursuant to ¶ 36 of the Purchase and Sale Agreement, the parties amended the Agreement to provide for the exchange of property owned by Henderson as part of the consideration of the Henderson sale. In addition to the terms of the Exchange Agreement the Inspection Period was extended to January 3, 2001. The Exchange Agreement further provided at ¶ 6: "Except as otherwise specified in this agreement, and amended herein, said Prior Agreement, as amended by the first amendment, second amendment, third amendment and fourth amendment and all terms and conditions thereof, shall remain in force and effect." (Dep. Exh. 67 at H261).

On December 12, 2000 Van Schaack's attorney again requested information from Nagel about the Krutzinger Lease.

On December 14, 2000 Nagel visited with her partner, Kermit Brown, about the issue with the Listing Contract. Brown recalls that they had a "pointed discussion about it." (Brown Dep. at 39–40). Brown told Nagel:

> ... provided it was some standard listing agreement that the real estate commission was using, that they're very difficult to litigate and they're very difficult to beat and, in my opinion, Jess was going to owe a commission on the sale of this ranch, and I thought that we ought

to advise him to that effect or that, Vonnie—not we, but Vonnie ought to advise him to that effect, because it was in the context of her asking, What do you think about this? How do you think I ought to approach her?

(Id. at 33–34). Brown thought that the advice Nagel should give Sun was, "that, more than likely, he was going to owe the commission, and that trying to beat realtors out of commissions when there's a sale that's consummated is not a very productive pursuit." (Id. at 34).

Sometime in December 2000 Nagel advised Sun that it was important to resolve the issue with the Listing Contract before closing the Henderson sale. Wade Dep. at 124, 11. 5–16.

During the same time period, Paul Dawkins called Sun. Sun recalls:

Paul Dawkins called me and he said do you agree that you owe us something for the time we put in on the T Bar? And my answer was technically, Bud, I don't agree. I don't owe you anything, but as I've told you before and I'll tell you again, I will cover your expenses on the deal. I should have known that I had a tax problem before I listed it, I told him that, and I didn't. I got some bad advice and I will be glad to cover your expenses.

.        .        .        .        .

He [Paul Dawkins] said when are you going to be in over in Denver. I said in fact—and I don't know whether it was the next day or couple of days but I was going to be over soon.

(Sun Dep. at 251—53).

A meeting was arranged among Sun, Paul Dawkins and Kent Dawkins for January 2, 2001 at the Centennial Airport in Arapaho County, Colorado. During the meeting there was a lengthy discussion about the Smith contract and why Sun thought it wasn't a "legal contract." (Kent Dawkins Dep. at 147). Kent Dawkins asked whether Sun would give them another listing. Sun's response was negative, although there are different versions of the precise response. According to Kent Dawkins, Sun responded "Are you kidding me? . . . I wouldn't give you a listing. And it's not for sale, number one; but if it was, I wouldn't give it to you." (Id. at 148). Dawkins then said, "Well, what can we do to resolve it and move on?" (Id). Sun replied, "The ranch is not for sale, I'm going to lease it, so it's over with. I'm not going to resell it. And I'm not going to put it back on the market." (Paul Dawkins Dep. at 236). According to Sun, he responded "Bud, considering our relationship over the last six months, my attorney would shoot me and I don't think it's a good idea. [I]t became very obvious in the conversations that I had with him that there was no way I was going to relist that property with him." (Sun Dep. at 259).

During the January 2 meeting Sun offered $10,000 to Van Schaack, which the Dawkinses rejected. Sun ended the January 2 meeting by saying, "Get back with me, let me know what you think is right." (Paul Dawkins Dep. at 236). Sun admits that during the January 2 meeting, "I told them that until I had my tax problems worked out completely I wasn't going to do anything with it." (Sun Dep. at 265–66).

Following the January 2 meeting, Paul Dawkins submitted to Sun a handwritten statement totaling $20,600 that included a commission on the Krutzinger lease and various marketing expenses. At that time, Sun called Paul Dawkins to say that he would consider paying $20,600 and a meeting was set for January 13, 2001 at the Cherry Hills Country Club in Englewood, Colorado.

Kent Dawkins recalls that before the meeting on January 13, 2001 he and Paul Dawkins discussed the release and Kent said, "Go ahead and do it . . . there's no

reason not to, you know recoup some of our money." (Kent Dawkins Dep. at 43). Kent Dawkins explained, "We discussed it, and I said, you know, it's okay to sign, you know, whatever was brought because we had no other indication that there was anything else transpiring, you know. He told us the ranch wasn't for sale, nothing was happening." (Id. at 124–25). Kent Dawkins further testified:

Q: Before the meeting on the 13th of January at the Cherry Hills Country Club when you were talking with your dad about the release—

A: (nodded head up and down.)

Q: —was it your understanding that Sun would be bringing to this meeting both a check for $20,600 and a release?

A: Yes.

Q. And if you got the payment, did you care whether it was a general release or a limited release?

A: I told him I—you know, I didn't state anything, I just said, you know, get the release.

Q. Well, tell the jury whether you and your dad agreed at that time that he would sign the release regardless of its terms as long as he got the payment?

A: Yes.

(Kent Dawkins Dep. at 249–50).

Nagel prepared a release on January 8 or 9, 2001.

On January 10, 2001 Nagel had a telephone conversation with Charles Prince of Lend Lease about the Henderson sale and the Equitable Loan. Nagel requested confidentiality. According to Prince, Nagel "was concerned, and I'm not sure from what point, about Vern George knowing about the sale." (Prince Dep. at 12).

In June 2001, Vern George and Van Schaack had offices in the same building. Vern George originated the 1998 Equitable Loan to Hub and Spoke to buy the T Bar Ranch and he had continuing responsibility for the account.

Nagel admits she told Prince that the sale should be confidential and that he should not disclose information about the sale to Vern George. Wade Dep. at 190, 11. 2–7.

During the January 10 conversation Prince made no promises to Nagel about whether he would keep the information confidential from Vern George. In a letter from Prince to Nagel dated January 12, 2001 Prince said:

You also mentioned that information about the sale is confidential. I do want to advise you that information in our file is available to Lend Lease Agri–Business employees, which includes Mr. Vern George. While we will not go out into public and make any announcements, it is information that is available within our company.

(Dep.Exh. 28).

On January 12, 2001 Nagel received confirmation from Weycer that Henderson had signed the Exchange Agreement and Amendment to the Purchase and Sales Agreement. Nagel agrees that by that time, "it looks like we're moving toward closing, yes." (Wade Dep. at 186).

On January 13, 2001 Sun met with Paul Dawkins for breakfast at the Cherry Hills Country Club in Englewood, Colorado. It is uncontroverted that during the meeting Sun told Dawkins that "the ranch was off the market" and that he was "going to lease it for a period of three years." (Paul Dawkins Dep. at 89). Sun stated, "After the three year period I don't know what I'm going to do with the ranch." (Id. at 241–42). Paul Dawkins cannot recall whether Sun said he would lease the ranch to Krutzinger Cattle Company or to Henderson. After Sun told Dawkins that the ranch was off the market and that he

intended to lease it, Dawkins agreed to sign the release.

The release was signed at the end of the January 13 meeting. If Paul Dawkins had known about the deal with Henderson, he would not have signed the release.

After Dawkins signed the release Sun wrote a check to Van Schaack for $20,600. Sun admits that during the January 13 meeting he never informed Paul Dawkins that he had a signed purchase agreement with Edmond Henderson or that the Henderson sale was set to close in five days.

During a telephone conversation between Prince and George on Friday, January 12, 2001 Prince told George that based on his conversation with Nagel "he thought a transaction was imminent." George was surprised because he hadn't had a conversation with Sun since early fall and he believed that Sun had decided not to sell the ranch. (George Dep. at 21). In fact, earlier in the year both Sun and the Dawkinses told him that the T Bar Ranch was off the market. By late summer 2000 George had the impression based on his conversations with Sun that "maybe he'd had a change of heart as to wanting to sell the property, whereas back in the spring he seemed to be pretty anxious to sell the property." (Id. at 76–77). George told Prince that he would try to speak with Sun because "[i]f there is a pending contract, you know, and you got something you want to close, then we need to generate whatever documentation necessary to accommodate that. So that's the reason I called." (Id. at 51).

Prince told George that Nagel had some concern about confidentiality because of the fact that George was acquainted with Van Schaack and that George officed in the same building as Van Schaack.

On Monday, January 15, 2001, at Charles Prince's suggestion, George spoke with Sun. Although Prince believed there was a pending contract, it was George's impression from his conversation with Sun on January 15 that no deal was "imminent." (Id. at 24).

George understood from Sun that there was no contract. He does not recall Sun identifying the prospective buyer. At the end of the conversation George believed "it was questionable as to whether he would actually sell the ranch." (George Dep. at 25).

George testified that during the conversation the parties discussed the following:

... the options available with regard to whether a potential buyer would assume the existing loan, whether we would provide a new loan in order to complete a transaction, whether a buyer might purchase the property subject to our loan, whether we might—if he were to sell the property in lieu of paying off the loan, he could purchase another property and we would consider doing a substitution of security. We basically reviewed options available to him, same type of review that we had—that I had done in the past as to—It was my expectation that he might explore those. There was nothing—there was essentially nothing for me to explore. He left me with the distinct impression that yes, he was—he was in negotiations. He didn't identify who his purchaser was. I wasn't left with any definitive impression as to what—how they might structure a purchase if it came—if it came to fruition. I simply didn't think any deal was imminent.

If it got to that point, if they actually came to some conclusion, I expected that he would have been back to me and said Here's—you know, essentially here's what we've agreed upon. What do you need to do with regard to the loan? (Id. at 23–24).

Based on George's conversation with Sun he would have been surprised to learn

that by January 12, 2000 the parties had a contract and they had signed it, and that by January 12, 2001 a closing was scheduled for January 18, 2001.

On January 18, 2001 in the offices of Henderson's attorney in Houston, Texas, Edmond Henderson and Jess Sun, on behalf of Hub and Spoke Ranch Company, signed a Fifth Amended Purchase and Sale Agreement and closed the sale of the T Bar Ranch. Edmond Henderson assigned the Purchase and Sale Agreement to Henderson Partners, Ltd. The parties to the sale agreed that the Hendersons paid a total of $3,850,000 for the ranch. However, Sun believes that some of the exchange properties are worth more than values agreed by the parties so that the total value of the consideration may exceed the agreed upon price. (Pretrial Order, Stipulation No. 14.) Sun believes that the actual purchase price was between $4,000,000 and $4,100,000.

The Fifth Amendment explicitly provides: "Except as herein modified, all other terms and conditions of the Agreement, as modified by the First Amendment, Second Amendment, Third Amendment and the Fourth Amendment, shall remain in full force and effect." (Dep. Ex. 67, at H278).

The contract that was closed on January 18, 2001 consisted of the June 2, 2000 Purchase and Sales Agreement, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment, the Exchange Agreement and the Fifth Amendment.

In February, 2001 the Dawkinses learned that the Hendersons had purchased the T Bar Ranch.

Van Schaack has provided written notice to Hub and Spoke that it has rescinded the "release" signed on January 13, 2001 and that it is ready, willing and able to pay Hub and Spoke the sum of $20,600, representing a return of the consideration recited in the "release" or credit that sum against any judgment.

Van Schaack does not contend that it brought a ready, willing, and able buyer to Hub & Spoke during the term of the Listing Agreement or the holdover period. Van Schaack did not negotiate with Henderson.

**Conclusions of Law**

The defendants have moved for summary judgment on both plaintiff's claim of breach of contract, asserting that no commission was earned pursuant to the terms of the Listing Contract as the sale to the Hendersons did not occur until after the Listing Period and, under § 14(c) the plaintiff did not either negotiate with the Hendersons or reserve their name in writing; and on plaintiff's fraud claim, arguing, for example, that the various representations cited by the plaintiff are technically true on their face. The plaintiff has moved for partial summary judgment, seeking a finding that the defendants breached the contract by failing to refer the Henderson offer to them. Having reviewed the evidence before the court, the court concludes that those facts compel denial of defendants' motion and the grant of the motion by the plaintiff.

With respect to plaintiff's contract claim, the court will deny defendants' motion for summary judgment. The defendants argue generally that no breach of the contract can exist, because the plaintiffs did not "earn" any commission pursuant to § 14(b) of the Listing Contract.[3] Although a sale was completed within the holdover period, defendants argue that

---

**3.** Plaintiff also argues that they are entitled to a commission based upon the Krutzinger

lease. The defendants contend that the contract does not cover the Krutzinger lease,

this does not meet the terms of § 14(b) since Van Schaack did not directly negotiate with the Hendersons, and had not submitted their name in writing to Hub and Spoke. However, the plaintiff has presented substantial evidence that, to the extent it did not meet either of these requirements, it was solely because of the pattern of deceit and misrepresentation by the defendants, which sought to prevent Van Schaack from learning of the active, ongoing negotiations between Henderson and Hub and Spoke. Under the circumstances here, enforcing the requirements contained in § 14(b) could have the effect of legitimating bad faith actions designed to thwart the integrity of the Listing Contract. Because of the outstanding questions as to the good faith of the defendants during the contract, summary judgment in favor of the defendants is inappropriate.

■ In contrast, the court finds that partial summary judgment in plaintiff's favor is justified, and will grant that party's motion seeking a determination that defendants breached their duty of referral under the contract. Section 4 of the Listing Contract unequivocally provides that Hub and Spoke would "conduct all negotiations for the Sale of the Property only through [Van Schaack], and to refer to [Van Schaack] all inquiries received in any form from real estate brokers, salespersons, prospective buyers, tenants or any other source during the time this Listing Contract is in effect."

since the Listing Contract only designates a "Sales Commission" in the amount of "5% of the gross sales price." § 14(a)(1); Section 14(a)(2) of the Listing Contract, which contains a form provision for the specification of a "Lease Commission," has been left blank. However, the court finds that this relates only to the question of the amount of the seller's responsibility, it does not affect the question of whether liability exists. This is because the Listing Contract unquestionably defines a "Sale" to mean a "voluntary transfer or ex-

Hub and Spoke did not and could not meet its obligation under the Listing Contract by forwarding the name of the Hendersons in the first instance, while subsequently engaging in a pattern of deception manifestly designed both to suggest that any offer by the Hendersons could not be accepted and to conceal the ongoing negotiations and agreements between the Hendersons and Hub and Spoke. The contract's requirement that Hub and Spoke conduct "all" negotiations through plaintiff, and refer "all inquiries ... in any form" to plaintiff inescapably obligated defendants to inform plaintiff of the Hendersons' continuing interest in the property.

■ By breaching the referral provision of an exclusive right to sell agreement, and subsequently selling the property on their own, the defendants are obligated to pay the commission set forth in the agreement. *See J.C. Nichols v. Osborn*, 12 F.Supp.2d 1196 (D.Kan.1998). Exclusive right to sell agreements play a valid and important role in real estate transactions.

> For the principal, the exclusive right agreement spurs on the broker to exercise his best efforts in selling the property within a discrete time period; for the broker, the agreement gives him a time period during which he can fully utilize all available resources with the assurance that his efforts will be rewarded if the property is sold within the time frame of the exclusive agreement.

change of any interest in the Property or the voluntary creation of the right to acquire any interest in the Property (including a contract or lease)." § 3 (emphasis added). However, since it is unclear at this time what an appropriate commission would be for the lease and in light of the court's independent determination that a 5% commission on the Henderson sale is appropriate in light of the breach of the referral clause, the court finds that summary judgment on the issue is not justified or necessary.

*The Kislak Co. v. Geldzahler,* 210 N.J.Super. 255, 509 A.2d 320 (1985). Pursuant to the agreement, both parties were obliged to fully and fairly inform the other of their actions relating to the subject of the contract.

Here, the defendants violated the Listing Contract by not referring Henderson to Van Schaack and by not informing Van Schaack of the June 2, 2000 Purchase and Sale Agreement or the subsequent amendments to that agreement. The defendants certainly did not meet their obligations under the Listing Contract by merely mentioning the potential interest of the Hendersons, while subsequently engaging in a pattern of deception designed to suggest both that the Henderson offer would not be acceptable and that in any event the property would not be sold in the near future.

■ With respect to Van Schaack's claim of fraud, summary judgment cannot be granted at the present time, since outstanding questions remain on the issue. Defendant's arguments in favor of summary judgment, arguments directed toward individual statements made by Sun, are unpersuasive. For example, they argue that Sun's statements that he was having tax problems were literally true, and thus cannot form the basis of a claim for fraud. Plaintiffs supply no authority for the idea that a statement, however much it may be designed to mislead a victim as to a larger set of facts and so work an injury upon him, cannot be actionable for fraud so long as it is technically true. Here, a reasonable inference from the evidence is that Sun, whatever the extent of his actual tax problems, repeatedly invoked those alleged tax problems in his conversations with his real estate broker in order to create the false impression that the T Bar Ranch would not sold within the near future. In short,

taken collectively, the statements of the defendants cited by plaintiff are sufficient to create a triable claim of fraud.

The defendants advance a last argument that any claim of fraud should be dismissed because of the release signed by the Dawkinses in early 2001. This argument carries little weight. The release occurred only days before defendants closed the sale to the Hendersons, and occurred in the midst of the defendants' ongoing concealment and misrepresentations regarding the property. Rendering all inferences in favor of the nonmovant, a rational finder of fact could conclude that the release itself was simply another product of defendants' fraudulent scheme.

IT IS ACCORDINGLY ORDERED this _____ day of February, 2003 that the Motion for Summary Judgment of the defendants (Dkt. No. 120) is denied; the Motion for Partial Summary Judgment by plaintiff (Dkt. No. 123) is granted as provided herein.